IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SCHALAMAR CREEK MOBILE
HOMEOWNER'S ASSOCIATION, INC.,
on behalf of the homeowner-members in its
representative capacity and on behalf of
themselves and all others similarly situated,

                                            CASE NO.

    Plaintiffs,

                                      CLASS ACTION REPRESENTATION
Vs.                                    AND DEMAND FOR JURY TRIAL
                                    INJUNCTIVE RELIEF SOUGHT

STEVEN ADLER,
LORRAINE DEMARCO,
R. SCOTT PROVOST,
CHARLES CROOK,
MARTI NEWKIRK,
MUREX PROPERTIES, L.L.C.,
THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,
RANDALL KNAPP,
JULIE JENNINGS, f/k/a Julie Knapp,
J & J SANITATION SERVICES, INC.,
OSPREY LINKS, LLC,
SCHALAMAR GP, INC.,
RICHARD LEE,
DAVID EASTMAN,
LUTZ, BOBO & TELFAIR, P.A.,
d/b/a Lutz, Bobo, Telfair, Eastman &
Lee, f/k/a Lutz, Webb & Bobo, P.A.,
FLORIDA MANUFACTURED HOUSING
ASSOCIATION, INC.,

    Defendants.
_____/

**COMPLAINT**

Table of Contents

| Section | | | Pg. |
|---|---|---|---|
| 1.0 | Introduction: | | 7 |
| | **The Defendants act and conspire to circumvent statutory regulations to defraud and exploit elderly mobile home owners** | | 7 |
| 2.0 | Jurisdiction and Venue | | 8 |
| 3.0 | **Statutory background:** | | 9 |
| | 3.1 | The Florida Legislature recognizes mobile home owners' "unique hybrid tenancy" and need for regulation to protect their significant basic property and other rights, including their bargaining position | 9 |
| | 3.2 | The United States Supreme Court and California Federal District Court recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners | 10 |
| | 3.3 | Florida Courts also recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners | 12 |
| | 3.4 | The Florida Mobile Home Act provides broad protections for mobile home owners | 13 |
| | 3.5 | The Florida Mobile Home Act provides significant obligations, duties and restrictions upon park owners | 14 |
| | 3.6 | The park owner may not collect a charge which results in payment of money previously collected as part of lot rental | 16 |
| | 3.7 | The park owner may not terminate a mobile home owner's continuous tenancy or evict but for very limited grounds | 16 |
| | 3.8 | The park owner must deliver to the home owner an administratively approved prospectus prior to entering into an enforceable lot rental agreement | 17 |

3.9     The park owner must provide a 90 day advance written notice
        before increase in lot rental amount, reduction in services or
        utilities, or change in rules and regulations                                18

3.10    The park owner may not interfere with the assumption of the
        resale seller's existing prospectus by the resale home purchaser    20

3.11    The Court has broad discretion to fashion relief for mobile
        home owners                                                                      21

4.0   Parties                                                                              22

      4.1     Plaintiff: Schalamar Creek Mobile Homeowner's Association, Inc.  22

      4.2     Defendants:                                                           23

              4.2.1    Steven Adler                                                23

              4.2.2    Lorraine DeMarco                                            24

              4.2.3    R. Scott Provost                                            25

              4.2.4    Charles Crook                                               25

              4.2.5    Marti Newkirk                                               26

              4.2.6    Murex Properties, L.L.C.                                    26

              4.2.7    The Northwestern Mutual Life Insurance Company     27

              4.2.8    Randall Knapp                                               28

              4.2.9    Julie Jennings                                              29

              4.2.10   J & J Sanitation Services, Inc.                             29

              4.2.11   Osprey Links, LLC                                           30

              4.2.12   Schalamar GP, Inc.                                          30

              4.2.13   Richard Lee                                                 31

              4.2.14   David Eastman                                               31

              4.2.15   Lutz, Bobo & Telfair, P.A.                                  32

              4.2.16   Florida Manufactured Housing Association, Inc.       32

5.0   Class Representation Allegations                                                  33

6.0     **The Scheme:**

Since 2015, the Defendants deceived over 250 elderly mobile home
resellers and purchasers into surrendering their statutory rights to
assume the resale sellers' existing prospectus. The Defendants instead
required the substitution of a new prospectus resulting in a significantly
higher lot rental, ad valorem tax pass-ons, and $10,000 to $15,000
reduction in resale value                                          37

6.1     The Florida Mobile Home Act recognizes the right of the
        resale mobile home purchaser to assume the remainder of the
        continuous or renewed term of the rental agreement between
        the mobile home park owner and the resale seller "... and shall
        be entitled to rely on the terms and conditions of the prospectus
        ... as delivered to the initial recipient."                      39

6.2     In 2015 Defendants Lee, Eastman, Lutz Bobo Law Firm, and
        FMHA intentionally corrupted statutory regulatory protections
        to mobile home owners when they lobbied, on behalf of themselves
        and the other Defendants, the Florida Department of Business and
        Professional Regulation and the Florida Legislature to amend
        § 723.059(5) to facilitate the surrendering of statutory rights to
        assume the remainder of the continuous or renewed term of the
        rental agreement between the mobile home park owner and the
        resale sellers                                                   40

6.3     Defendants lied to the elderly Plaintiff home owners that the
        newer P6 prospectus and its significantly higher lot rental would
        be required only for purchasers of new homes in the Park         41

6.4     Defendants required elderly resale home purchasers to assume
        the P6 prospectus by signing complicated "lease assumption"
        and "prospectus receipt" documents                              42

6.5     Defendants manipulated some elderly resale home purchasers to
        the higher rent P6 prospectus using "rent discount coupons,"
        $250 incentive awards to resale sellers, and other incentives to
        adopt the P6 prospectus                                         43

6.6     Plaintiffs-homeowner scenarios: representative examples of
        Defendants' false statements and fraudulent omissions           44

|   | 6.6.1 | JoRene Finkle | 45 |
|   | 6.6.2 | Doug Phillips | 46 |
|   | 6.6.3 | Fred and Leanna Parsons | 47 |
|   | 6.6.4 | Patrick and Joette Kelly | 48 |
|   | 6.6.5 | Debra and Kevin McKenna | 48 |
|   | 6.6.6 | William Duke | 50 |
|   | 6.6.7 | Johanna Kerman | 50 |

| | 6.7 | Defendants concealed public disclosure of the Scheme by threatening litigation against homeowners, instructing employees to never discuss the P6 prospectus | 50 |
| | 6.8 | Mail and Wire Fraud | 51 |
| | 6.9 | Extortion | 59 |

| **7.0** | **Claims** | | **62** |
| | **7.1** | **Count One – RICO** | **62** |
| | | 7.1.1 Adler-DeMarco-Provost-Crook-Newkirk-Knapp-Jennings-Lee-Eastman Enterprise | 62 |
| | | 7.1.2 Alternative 1: Murex Properties Enterprise | 64 |
| | | 7.1.3 Alternative 2: Schalamar Mobile Home Park Enterprise | 64 |
| | | 7.1.4 Alternative 3: Lee Enterprise | 66 |
| | | 7.1.5 Alternative 4: Lutz Bobo Law Firm Enterprise | 66 |
| | | 7.1.6 Alternative 5: DBPR-Florida-Legislature Enterprise | 67 |
| | **7.2** | **Count Two – RICO** | **69** |
| | | 7.2.1 Corporate Enterprise | 69 |
| | | 7.2.2 Alternative 1: Murex Properties Enterprise | 71 |
| | | 7.2.3 Alternative 2: Schalamar Mobile Home Park Enterprise | 72 |
| | | 7.2.4 Alternative 3: Lee Enterprise | 73 |
| | | 7.2.5 Alternative 4: Lutz Bobo Law Firm Enterprise | 74 |
| | | 7.2.6 Alternative 5: DBPR-Florida-Legislature Enterprise | 75 |
| | **7.3** | **Count Three – RICO** | **77** |

**7.4**   **Count Four – RICO Conspiracy**                                    79

    7.4.1   Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and/or FMHA conspired with Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or Eastman                                    79

    7.4.2   Northwestern Mutual conspired with Lee, Eastman and/or Adler                                    80

    7.4.3   Schalamar GP conspired with Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee and/or Eastman                                    80

    7.4.4   Schalamar GP and Osprey Links conspired with Lee, and/or Eastman                                    80

**7.5**   **Count Five – Unjust Enrichment**                                    82

**7.6**   **Count Six – Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**                                    83

**7.7**   **Count Seven – Denial of Rights of Access under Americans with Disabilities Act ("ADA")**                                    87

    7.7.1   Site Entrance Signage                                    89

    7.7.2   Accessible Parking                                    89

    7.7.3   Exterior Accessible Routes                                    89

    7.7.4   Accessible Doors                                    89

    7.7.5   Lack of elevator                                    90

    7.7.6   Restrooms                                    85

    7.7.7   Seating & Tables in restaurant                                    90

    7.7.8   General                                    90

    7.7.9   Failure to Make an Altered Facility Accessible                                    92

    7.7.10   Failure to Modify Existing Policies and Procedures                                    92

**8.0**   Demand for Jury Trial                                    93

**9.0**   Relief Requested                                    93

Plaintiff Schalamar Creek Mobile Homeowner's Association, Inc., on behalf of themselves and all others similarly situated, by and through the undersigned counsel, brings this lawsuit against Defendants Steven Adler, an individual, Lorraine DeMarco, an individual, R. Scott Provost, an individual, Charles Crook, an individual, Marti Newkirk, an individual, Murex Properties, L.L.C., a Florida Limited Liability Company, The Northwestern Mutual Life Insurance Company, a Foreign (Wisconsin) Corporation, Randall Knapp, an individual, Julie Jennings, f/k/a Julie Knapp, an individual, J & J Sanitation Services, Inc., a Florida Corporation, Osprey Links, LLC, a Florida Limited Liability Company, Schalamar GP, Inc., a Florida Corporation, Richard Lee, an individual, David Eastman, an individual, Lutz, Bobo & Telfair, P.A., d/b/a Lutz, Bobo, Telfair, Eastman & Lee, f/k/a Lutz, Webb & Bobo, P.A., a Florida Corporation, and Florida Manufactured Housing Association, Inc., a Florida Corporation, collectively referred to herein as "Defendants," and alleges:

**1.0    Introduction:**

**The Defendants act and conspire to circumvent statutory regulations to defraud and exploit elderly mobile home owners**

1.     This is a class action of current and past mobile homeowners who own or owned a mobile home and lease or leased the lot underneath their home at the Schalamar Creek Golf Mobile Home Park and is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, *et seq.*, and various other federal and state common law doctrines or statutes. This action arises out of Defendants' fraudulent and conspiratorial acts to illegally and unreasonably:

- force the surrender of the Plaintiff homeowners' resale purchasers' right to assume the resale sellers' less expensive lot rental prospectus (denoted P1 through P5) and instead require the Plaintiff homeowners to assume and adopt a later P6 prospectus requiring significantly higher lot rental, an increased rent escalation percentage, and causing a $10,000 to $15,000 reduction in resale value;

- require payment by the Plaintiff homeowners of fraudulent, excessive, and improperly calculated ad valorem tax pass-ons resulting from the fraudulent 2011 sale and purchase of the Park by the Defendants and currently illegal and fraudulent inclusion of ad valorem tax pass-ons related to income producing portions of the Park clubhouse, a bank, a restaurant, and RV storage lot;

- retaliate against the representative Plaintiff Schalamar Creek Mobile Homeowner's Association, Inc., and Plaintiff homeowners who are critical of the Defendants' insistence that all listing or purchasing homeowners assume and adopt the P6 prospectus;

- require direct-billed annual payment by the Plaintiff homeowners of perpetual sanitation costs to Defendant Julie Jennings, Defendant Randall Knapp's sister and her family-owned corporation, J & J Sanitation Services, Inc., as a condition of home ownership;

- extort the representative Plaintiff Schalamar Creek Mobile Homeowner's Association, Inc., and the Plaintiff homeowners to amend the lot rental agreement for all homeowners in the Schalamar Creek Golf Mobile Home Park to pay cableTV and Internet assessments as a pass-on in the lot rental;

- deprive the elderly and disabled Plaintiff homeowners of a handicap accessible Park clubhouse, facilities, golf course, and common areas.

Plaintiffs request a declaratory judgment that Defendants' conduct violates various Federal and Florida laws, and seeks an award of treble damages, actual, statutory, and to the extent permitted, punitive damages, attorneys fees and costs for themselves and each member of the Class.

## 2.0    Jurisdiction and Venue

2.      This action is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, *et seq*., and various other state common law doctrines or statutes. Jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1331. Plaintiffs' claims brought under state law are so related to Plaintiffs' federal claims, over which the Court has original jurisdiction, that they form part of the same case or controversy. Under Article III of the United States Constitution, the Court has

supplemental jurisdiction over Plaintiffs' related state common law and statutory claims pursuant to 28 U.S.C. § 1367. The Plaintiffs seek damages and declaratory relief pursuant to 28 U.S.C. § 2201.

3.     In the alternative, the ends of justice require that the Court exercise personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(b) in that the Court has personal jurisdiction over at least one defendant, (2) the defendants engaged in a multi-district conspiracy, and (3) there is no other district in which a Court would have personal jurisdiction over all of the Defendants.

4.     A substantial part of the events and omissions giving rise to the claims stated herein occurred in this District and a substantial part of the property that is the subject of this action is situated in this District. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) and pursuant to 18 U.S.C. § 1965(b).

**3.0     Statutory background:**

**3.1     The Florida Legislature recognizes mobile homeowners' "unique hybrid tenancy" and need for regulation to protect their significant basic property and other rights, including their bargaining position**

5.     Florida mobile homeowners typically rent the lot underneath their home from the mobile home park owner pursuant to a long term lease. In 1992 the Florida Legislature recognized this unique hybrid tenancy and the mobile homeowners' need for regulation to protect their significant basic property and other rights, including their bargaining position once occupancy has commenced:

                                        ***

> The Legislature finds that there are factors unique to the relationship between a mobile home owner and a mobile home park owner. **Once occupancy has commenced, unique factors can affect the bargaining position of the parties and can affect the operation of market forces.** Because of those unique factors, there exist inherently real and substantial differences in the relationship which distinguish it from other landlord-tenant

relationships. The Legislature recognizes that mobile home owners have basic property and other rights which must be protected. The Legislature further recognizes that the mobile home park owner has a legitimate business interest in the operation of the mobile home park as part of the housing market and has basic property and other rights which must be protected. This chapter is created for the purpose of regulating the factors unique to the relationship between mobile home owners and mobile home park owners in the circumstances described herein. It recognizes that **when such inequalities exist between mobile home owners and mobile home park owners as a result of such unique factors, regulation to protect those parties to the extent that they are affected by the inequalities, while preserving and protecting the rights of both parties, is required.**

***

§ 723.004(1)(Emphasis added), 1992 Fla. Sess. Law Serv. Ch. 92-148 (C.S.H.B. 217

**3.2    The United States Supreme Court and California Federal District Court recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners**

6.    In the 1992 United States Supreme Court decision in *Yee v. City of Escondido, Cal.,* Justice O′Connor similarly observed the unique or hybrid nature of a mobile home tenancy and that once occupancy has commenced that ″... it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter [California′s similar Mobilehome Residency Law, Cal.Civ.Code Ann. § 798 et seq.]...″:

> The term ′mobile home′ is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved. Hirsch & Hirsch, *Legal–Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol*, 35 UCLA L. Rev. 399, 405 (1988). A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific

Page 10

improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.

In 1978, California enacted its Mobilehome Residency Law, Cal.Civ. Code Ann. § 798 et seq. (West 1982 and Supp.1991). The legislature found "that, because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the cost of landscaping or lot preparation, **it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter."** § 798.55(a).

*Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522 (1992)(Emphasis added)

7.     And in the 2010 decision of *Guggenheim v. City of Goleta,* the United States District Court for the Central District of California construed the same California remedial mobile home statute and observed that: "… Mobile homes have the peculiar characteristic of separating ownership of homes that are, as a practical matter, affixed to the land, from the land itself. **Because the owner of the mobile home cannot readily move it to get a lower rent, the owner of the land has the owner of the mobile home over a barrel**….." 638 F.3d 1111 (9th Cir. 2010)[footnotes omitted][Emphasis Added]

**3.3    Florida Courts also recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners**

8.      In the 1992 decision in *Herrick v. Florida Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* the First District Court of Appeal reaffirmed that the Florida Mobile Home Act is a remedial statute enacted to protect mobile homeowners. 595 So.2d 148 (Fla. 1st DCA 1992):

***

> **… [T]he purpose for enacting The Florida Mobile Home Act was to protect mobile homeowners, by equalizing the economic leverage mobile home park owners hold over the tenants.** 1 J. Hauser, *Florida Residential Landlord–Tenant Manual,* Chapter 8 (Supp.1991). In *Stewart v. Green*, 300 So.2d 889 (Fla.1974) and *Palm Beach Mobile Homes, Inc. v. Strong*, 300 So.2d 881 (Fla.1974), the supreme court observed that the legislature had finally recognized "that a hybrid type of property relationship exists between the mobile home owner and the park owner and that the relationship is not simply one of landowner and tenant." *Stewart*, 300 So.2d at 892. Mobile home tenancy usually involves persons who own their residences which are of considerable size, and once set up in a park, the residences are not mobile in the real sense of the word. "**Because of the difficulties inherent in moving the home from one settled location to another, … it is hard to imagine a situation where the park owner and the tenants are in an equal bargaining position on rent increases.**" *Belcher v. Kier,* 558 So.2d 1039, 1042 (Fla. 2d DCA), *review denied,* 570 So.2d 1305 (Fla.1990). *See also Harris v. Martin Regency, Ltd.,* 576 So.2d 1294, 1297 (Fla.1991); *Lanca Homeowners, Inc. v. Lantana Cascade of Palm Beach, Ltd.,* 541 So.2d 1121, 1124 (Fla.), *cert. denied,* 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989); *B.J. Pearce v. Doral Mobile Home Villas, Inc.*, 521 So.2d 282 (Fla. 2d DCA 1988). The current costs of moving a mobile home range from $4,000 to $10,000. *See* 1 J. Hauser, *Landlord–Tenant Manual,* at 69.
>
> **The delivery of a prospectus** to all residents of a mobile home park containing twenty-six or more lots, is **one factor in the legislative effort to afford protection to occupants and prospective occupants** of a park. The prospectus is a disclosure document. Villa*ge Park Mobile Home Assoc. v. State, Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* 506 So.2d 426, 428 (Fla. 1st DCA), *review denied*, 513 So.2d 1063 (Fla.1987). It is drafted by the park owner,

and must contain information as specified by [section 723.012, *Florida Statutes,* including a description of the manner in which utilities and other services are to be provided, an explanation of the manner in which lot rentals will be increased, a provision for ninety days advance notice of any increase or reduction in service, and disclosure of any rate increase or pass through charges to which the homeowner could be subjected. *Village Park v. Dept. of Business Regulation,* 506 So.2d at 428. That is, the prospectus delineates the basis for, and the procedure governing, future rent increases. [*Id.,* at 429.] Unless the park owner fully discloses all proposed fees, charges, and assessments, he waives the right to obtain such in the future. *Lemon v. Aspen Emerald Lakes Assoc., Ltd.,* 446 So.2d 177 (Fla. 5th DCA 1984)]

***

*Herrick v. Florida Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* 595 So.2d 148 (Fla. 1st DCA 1992)(Emphasis added)

**3.4     The Florida Mobile Home Act provides broad protections for mobile home owners**

9.     The homeowner protections of the Florida Mobile Home Act include:

- An express statutory obligation of good faith and fair dealing in the performance or enforcement of every rental agreement or duty;[1]

- "Lot rental agreement" is broadly defined to include "any mutual understanding or lease, whether oral or written;" [2]

- Required statutory provisions are deemed to be a part of the lot rental agreement;[3]

- Lot rental agreement may not contain any rule or regulation prohibited by or inconsistent with the Florida Mobile Home Act;[4]

- Any provision in the lot rental agreement is void and unenforceable to the extent that it attempts to waive or preclude the rights, remedies, or requirements set forth in the Florida Mobile Home Act or arising

---

1     § 723.021
2     § 723.003(10)
3     § 723.031(2)
4     § 723.031(1)

under law;[5]

- Park rules and regulations and the prospectus are deemed to be incorporated into the lot rental agreement;[6]

- Rental terms shall be for a minimum of one year;[7]

- No rental agreement shall provide for, nor be construed for, the termination of tenancy or the eviction of a mobile home owner on a ground other than one contained in § 723.061.[8]

### 3.5   The Florida Mobile Home Act provides significant obligations, duties and restrictions upon park owners

10.    "Park owner" is broadly defined to also include the property operator who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park.[9] The obligations, duties, and restrictions imposed upon both park owner and operator include:

- The park owner must comply with applicable building, housing, and health codes;

- The park owner must maintain buildings and improvements in common areas in a good state of repair and maintenance;[10]

- The park owner must maintain the common areas in a good state of appearance, safety, and cleanliness;[11]

- The park owner must provide access to common areas, including buildings and improvements at all reasonable times for the homeowners and their guests.[12]

---

5    § 723.032(2)
6    § 723.031(10)
7    § 723.031(4)
8    §§723.031(9), 723.032(1)
9    §§ 723.003(13), 723.003(16)
10   § 723.022(2)
11   § 723.022(2)
12   § 723.022(3)

- The park owner must maintain utility connections and systems in proper operating condition;[13]

- The park owner must comply with park rules and regulations and require that other persons also comply and conduct themselves in a manner that does not unreasonably disturb the homeowners or constitute a breach of the peace;[14]

- The park owner is expressly prohibited from committing unreasonable acts. "Unreasonable" is defined to mean arbitrary, capricious, or inconsistent with the Florida Mobile Home Act;[15]

- The park owner is expressly prohibited from committing discriminatory acts. "Discriminatory" means that a homeowner is being treated differently as to the rent charged, the services rendered, or an action for possession or other civil action being taken by the park owner, without a reasonable basis for the different treatment;[16]

- The park owner may not discriminatorily increase a home owner's lot rent or discriminatorily decrease services to a home owner, or bring or threaten to bring an action for eviction or other civil action primarily because the park owner is retaliating against the home owner. The park owner may not retaliate against the homeowner for: 1) his or her good faith complaints to a governmental agency charged with enforcing regulations in a mobile home park; 2) the homeowner's organization, encouragement, or participation in a homeowner's association; or 3) the homeowner has complained to the park owner for failure to comply with §723.022. [17]

---

13   §723.022(4)
14   § 723.022(5)
15   §§ 723.003(20), 723.033(3), 723.037(5), 723.037(5), 723.037(5), 723.054(2), 723.059(1), 723.025
16   §§ 723.003(1), 723.031(5), 723.058(5), 723.0615
17   § 723.0615

**3.6** **The park owner may not collect a charge which results in payment of money previously collected as part of lot rental**

11.     The park owner may not collect a charge which results in payment of money for sums previously collected as part of the lot rental amount:

- Ad valorem property taxes, non-ad valorem assessments, and utility charges may be passed on only if those charges are not otherwise being collected in the remainder of the lot rental amount and they were disclosed prior to tenancy, were being passed on as a matter of custom between the park owner and the mobile home owner, or the passing on was authorized by law;[18]

- Ad valorem property taxes, non-ad valorem assessments, and utility charges may be passed on only within one year of the date the park owner remits payment of the charge.[19]

**3.7** **The park owner may not terminate a mobile homeowner's continuous tenancy or evict but for very limited grounds**

12.     A properly promulgated rule or regulation may not be arbitrarily applied and used as a ground for eviction.[20] Those very limited grounds for termination of tenancy and eviction of a mobile home owner, occupant, or home are:

- nonpayment of lot rental;[21]

- conviction of a crime committed in the Park detrimental to the health, safety, or welfare of other residents of the mobile home park;[22]

- violation of rule or regulation, rental agreement provision, or the Florida Mobile Home Act which is found by any court to have been an act that endangered the life, health, safety, or property of the park

---

18      § 723.031(5)(c)
19      § 723.031(5)(c)
20      § 723.061(1)(c)
21      § 723.061(1)(a)
22      § 723.061(1)(b)

residents or employees or the peaceful enjoyment of the mobile home park by its residents;[23]

- a second violation of the same rule or regulation, rental agreement provision, or the Florida Mobile Home Act within 12 months if the park owner has noticed the mobile home owner, tenant, or occupant within 30 days after the first violation, which specified the actions of the mobile home owner, tenant, or occupant that caused the violation and gave the mobile home owner, tenant, or occupant 7 days to correct the noncompliance;[24]

- a change in use of the land comprising the mobile home park, or the portion thereof from which mobile homes are to be evicted, from mobile home lot rentals to some other use.[25]

**3.8   The park owner must deliver to the homeowner an administratively approved prospectus prior to entering into an enforceable lot rental agreement**

13.     The prospectus or offering circular together with its exhibits is a disclosure document intended to afford protection to mobile homeowners. The purpose of the document is to disclose the representations of the mobile home park owner concerning the operations of the mobile home park.[26] It must detail the Park services, facilities, and all financial obligations of the tenancy:

- Prior to entering into an enforceable rental agreement for a mobile home lot, the park owner shall deliver to the homeowner a prospectus approved by the division together with all of the exhibits. Delivery shall be made prior to execution of the lot rental agreement or at the time of occupancy, whichever occurs first;[27]

---

23     § 723.061(1)(c)1
24     § 723.061(1)(c)2
25     § 723.061(1)(d)
26     § 723.011(3)
27     §§ 723.011(1)(a) and (2); *see also Rule* 61B-31.001(12), *Fla. Admin. Code*

- The park owner may request that the homeowner sign a receipt indicating that the homeowner has received a copy of the prospectus, the rules and regulations, and other pertinent documents so long as any such documents are clearly identified in the receipt itself. Such a receipt shall indicate nothing more than that the documents identified herein have been received by the mobile home owner;[28]

- If the park owner fails to deliver the prospectus and exhibits to the prospective lessee prior to the execution of the lot rental agreement or prior to initial occupancy, the rental agreement is voidable by the lessee until 15 days after the receipt by the lessee of the prospectus and exhibits. Upon written notice of cancellation by the lessee, the lessee will be entitled to a refund from the park owner of any deposit together with relocation costs for the mobile home, or the market value of the home and any paid appurtenances.[29]

**3.9   The park owner must provide a 90 day advance written notice before increase in lot rental amount, reduction in services or utilities, or change in rules and regulations**

14.      The park owner must give written notice to each affected mobile home owner and the board of directors of the homeowners' association at least 90 days before any increase in lot rental amount or reduction in services or utilities provided by the park owner or change in rules and regulations:

- The home owner's right to the 90-day notice may not be waived or precluded by a home owner, or the homeowners' committee, in an agreement with the park owner;[30]

---

28      § 723.011(5)
29      § 723.014
30      § 723.037(1)

- The park owner may be compelled by the incorporated homeowners' association to meet with the association's statutory negotiating committee to explain the material factors which accompany the decision to increase the lot rental or reduce services, or change utilities;[31]

- At the meeting, the park owner shall in good faith disclose and explain all material factors resulting in the decision to increase the lot rental amount, reduce services or utilities, or change rules and regulations, including how those factors justify the specific change proposed. The park owner may not limit the discussion of the reasons for the change to generalities only, such as, but not limited to, increases in operational costs, changes in economic conditions, or rents charged by comparable mobile home parks. For example, if the reason for an increase in lot rental amount is an increase in operational costs, the park owner must disclose the item or items which have increased, the amount of the increase, any similar item or items which have decreased, and the amount of the decrease. If an increase is based upon the lot rental amount charged by comparable mobile home parks, the park owner shall disclose, and provide in writing to the committee at or before the meeting, the name, address, lot rental amount, and any other relevant factors relied upon by the park owner, such as facilities, services, and amenities, concerning the comparable mobile home parks. The information concerning comparable mobile home parks to be exchanged by the parties is to encourage a dialogue concerning the reasons used by the park owner for the increase in lot rental amount

---

31      § 723.037(4)(b)1

and to encourage the home owners to evaluate and discuss the reasons for those changes with the park owner. The park owner shall prepare a written summary of the material factors and retain a copy for 3 years. The park owner shall provide the committee a copy of the summary at or before the meeting;[32]

- "Market rent" is defined to mean that rent which would result from market forces absent an unequal bargaining position between mobile home park owners and mobile home owners;[33]

- In determining market rent, the court may consider rents charged by comparable mobile home parks in its competitive area. To be comparable, a mobile home park must offer similar facilities, services, amenities, and management.[34]

**3.10   The park owner may not interfere with the assumption of the resale seller's existing prospectus by the resale home purchaser**

15.     The resale mobile home owner has a statutory right to sell his or her home and accompanying pre-existing prospectus. The resale purchaser also has an express statutory right to assume the resale seller's existing prospectus:

- A purchaser of a mobile home has the right to assume the remainder of the term of any rental agreement then in effect between the park owner and the seller and shall be entitled to rely on the terms and conditions of the prospectus or offering circular as delivered to the initial recipient;[35]

---

32      § 723.037(4)(b)
33      § 723.033(4)
34      § 723.033(5)
35      § 723.059(3); *Rule* 61B-31.001(4), *Fla. Admin. Code:* (4) "The prospectus distributed to a home owner or prospective home owner shall be binding for the length of the tenancy, including any assumptions of that tenancy, and may not be changed except in the following circumstances: ..."

- A park owner may increase the rental amount to be paid by the purchaser upon the expiration of the assumed rental agreement in an amount deemed appropriate by the mobile home park owner, so long as such increase is disclosed to the purchaser prior to his or her occupancy and is imposed in a manner consistent with the initial offering circular or prospectus and the Florida Mobile Home Act;[36]

- Lifetime leases and the renewal provisions in automatically renewable leases, both those existing and those entered into after July 1, 1986, are not assumable unless otherwise provided in the mobile home lot rental agreement or unless the transferee is the home owner's spouse. The right to an assumption of the lease by a spouse may be exercised only one time during the term of that lease.[37]

**3.11    The Court has broad discretion to fashion relief for mobile homeowners**

16.    The Court may:

- find a mobile home lot rental amount, rent increase, or change, or any provision of the rental agreement, to be unreasonable. The court may enforce the remainder of the lot rental agreement without the unreasonable provision or limit the application of the unreasonable provision so as to avoid any unreasonable result;[38]

- find that a party to a lot rental agreement or duty under the Florida Mobile Home Act has not complied with its obligations of good faith and fair dealing and award reasonable attorneys fees and costs to the prevailing party for proving noncompliance;[39]

---

36      § 723.059(4)
37      § 723.059(5)
38      § 723.033(1)
39      § 723.021

- rescind a contract or award damages to a mobile homeowner who
  reasonably relies upon any material statement or information that is
  false or misleading and published by or under authority from the park
  owner in advertising and promotional materials, including, but not
  limited to, a prospectus, the items required as exhibits to a prospectus,
  brochures, and newspaper advertising.[40]

## 4.0   Parties

## 4.1   Plaintiffs: Schalamar Creek Mobile Homeowner's Association, Inc. ("Schalamar HOA")

17.   Plaintiff The Schalamar Creek Mobile Homeowner's Association, Inc., ("Schalamar HOA") is an incorporated mobile home owner association and the legal representative under § 723.075 (1), *Fla. Stat.*, of a class of 1,000 elderly current and former bona fide mobile home owners in the Schalamar Creek Golf Mobile Home Park, 4500 US Highway 92 East, Polk County, Lakeland, Florida. Schalamar Creek Golf Mobile Home Park is an age 55 and older mobile home park with 876 mobile home lots (with a maximum of 1,000 lots expected).

18.   Schalamar HOA represents all of the mobile homeowners in the Park "... in all matters relating to the Florida Mobile Home Act." *See* §§ 723.075(1) and 723.076(1); *see also Rule* 1.222, *Fla. R. Civil P.*[41]

---

40      § 723.017
41      § 723.075(1); *see also Rule 1.222: Fla. Civ. P. ,* Mobile Homeowners' Associations*,* which reads:

A mobile homeowners' association may institute, maintain, settle, or appeal actions or hearings in its name on behalf of all homeowners concerning matters of common interest, including, but not limited to: the common property; structural components of a building or other improvements; mechanical, electrical, and plumbing elements serving the park property; and protests of ad valorem taxes on commonly used facilities. If the association has the authority to maintain a class action under this rule, the association may be joined in an action as representative of that class with reference to litigation and disputes involving the matters for which the association could bring a class action under this. Nothing herein limits any statutory or common law right of any individual homeowner or class of homeowners to bring any action which may otherwise be available. An action under this rule shall not be subject to the requirements of rule 1.220.

*Lanca Homeowners, Inc. v. Lantana Cascade of Palm Beach, Ltd.*, 541 So.2d 1121 (Fla. 1988)("... we similarly note that the **unique features of mobile home residency call for an effective procedural format**

19.     The officers and directors of the Schalamar HOA have a fiduciary relationship to the homeowners and must discharge their duties in good faith.[42]

20.     Schalamar HOA has the authority to initiate mediation and litigation on behalf of all of the homeowners regarding an increase in lot rental amount, reduction in services or utilities, or change of rules and regulations.[43]

21.     If the park owner offers the Park for sale to the general public or receives an "unsolicited" offer to purchase the Park, the Schalamar HOA has a right to be notified of the offer, the price and the terms and conditions of sale, and permitted 45 days to execute a contract meeting the price, terms and conditions.[44] Schalamar HOA has the express statutory right to negotiate for, acquire, and operate the mobile home park on behalf of the mobile home owners.[45]

## 4.2     Defendants

### 4.2.1   Steven Adler ("Adler")

22.     Defendant Steven Adler ("Adler") is an individual who currently resides in Lee County, Florida. Adler is a partner and co-investor with Defendant The Northwestern Mutual Life Insurance Company. Adler is the President, CEO, Owner, and the managing member of Defendant Murex Properties, L.L.C., since 2004 in Lee County, Florida at 12629 New Brittany Blvd., Bldg. 16, Fort Myers, Florida. Adler is also the managing member of the following Murex-related entities at the above Fort Myers address: Murex Management, LLC, and Murex Home Sales, LLC (since 2007); Murex Entertainment, LLC (since 2011); and Murex Housing, LLC (since 2018). Adler is also

---

for resolving disputes between park owners and residents concerning matters of shared interest. **Again, we recognize the usefulness of the policy sought to be asserted by the legislature.** Pursuant to Florida Rule of Judicial Administration 2.130(a), we adopt the following to be titled "*Mobile Homeowners' Association,*" to be numbered *Florida Rule of Civil Procedure 1.222*, and to be effective immediately....") (Emphasis Added)

42     § 723.078(2)(c)8
43     § 723.037(1)
44     § 723.071(1)(a)
45     §§ 723.077(1), 723.079(1) and (3)

engaged in business at Schalamar Creek Golf Mobile Home Park, 4500 US Highway 92 East, Polk County, Lakeland, Florida.

23.    Adler is the "mobile home park owner" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Adler is also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

24.    Adler is the current membership committee chair for Defendant Florida Manufactured Housing Association, Inc., and has previously held leadership positions for Defendant Florida Manufactured Housing Association, Inc.

**4.2.2   Lorraine DeMarco ("DeMarco")**

25.    Defendant Lorraine DeMarco ("DeMarco") is an individual who currently resides in Polk County, Florida. DeMarco is an employee of Defendant Murex Properties, and is the Home Sales Manager for Murex Properties, at Schalamar Creek Golf Mobile Home Park, 4500 U.S. Highway 92 East, Lakeland, Florida.

26.    DeMarco is the "mobile home park owner" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." DeMarco is also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.3   R. Scott Provost ("Provost")

27.      Defendant R. Scott Provost ("Provost") is an individual who currently resides in Polk County, Florida. Provost is a Regional Vice President (since July 2017) and an employee of Defendant Murex Properties. Provost was formerly the Home Sales Manager for Murex Properties at Schalamar Creek Golf Mobile Home Park, 4500 U.S. Highway 92 East, Lakeland, Florida.

28.      Provost is the "mobile home park owner" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Provost is also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.4   Charles Crook ("Crook")

29.      Defendant Charles Crook ("Crook") is an individual who currently resides in Pinellas County, Florida. Crook is formerly an employee of Defendant Murex Properties, and was the Vice President from February 2015 to August 2017 for Murex Properties, at Schalamar Creek Golf Mobile Home Park. His responsibilities "... included the day to day management of a nationwide portfolio of manufactured home communities [and c]omplete P & L responsibility including sales, marketing, operations, customer service, construction and asset management."[46]

30.      Crook was the "mobile home park owner" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Crook was also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority

---

46        https://www.linkedin.com/in/charles-crook-a2050950/

to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.5  Marti Newkirk ("Newkirk")

31.     Defendant Marti Newkirk ("Newkirk") is an individual who currently resides in Polk County, Florida. Newkirk is formerly an employee of Defendant Murex Properties, and was the Community Manager from May 2005 to December 2017 for Murex Properties, at Schalamar Creek Golf Mobile Home Park.

32.     Newkirk was the "mobile home park owner" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." DeMarco was also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.6  Murex Properties, L.L.C. ("Murex Properties")

33.     Defendant Murex Properties, L.L.C. ("Murex Properties"), is a Foreign (Michigan) limited liability company since 2004 in Lee County, Florida at 12629 New Brittany Blvd., Bldg. 16, Lee County, Fort Myers, Florida and is also engaged in business at Schalamar Creek Golf Mobile Home Park, 4500 US Highway 92 East, Polk County, Lakeland, Florida.

34.     Murex Properties is the "mobile home park owner" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Murex Properties is also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration

and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Murex Properties is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.7 The Northwestern Mutual Life Insurance Company ("Northwestern Mutual")

35.     Defendant The Northwestern Mutual Life Insurance Company ("Northwestern Mutual"), is a Foreign (Wisconsin) corporation since 1957 at 720 East Wisconsin Ave., Milwaukee, Wisconsin and is engaged in business at Schalamar Creek Golf Mobile Home Park, 4500 US Highway 92 East, Polk County, Lakeland, Florida. Northwestern Mutual and a relevant subsidiary include Northwestern Mutual Investment Management Company, LLC, which manages Northwestern Mutual's investments in, *inter alia*, mortgage loans and real estate equity.

36.     Northwestern Mutual is the "mobile home park owner" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Northwestern Mutual is also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Northwestern Mutual is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.8   Randall Knapp ("Knapp")

37.      Defendant Randall Knapp ("Knapp") is an individual who currently resides in Polk County, Florida at 361 Denton Ave., Auburndale, Florida.

a.      Knapp is a Managing Member of Schalamar Development Group, LLC, a Florida limited liability company since 2005, which operates in Polk County, Florida at 361 Denton Ave., Auburndale, Florida.

b.      Knapp is a Director, and former President/Treasurer/Secretary of Schalamar GP, a Florida corporation since 1999 (*dissolved September 22, 2017*), which operated in Polk County, Florida at 361 Denton Ave., Auburndale, Florida. The corporation was capitalized with 1,000 shares of common stock at $1.00 par value per share or a total, of $1,000.00.

c.      Knapp is a Director, and former Treasurer/Secretary of Schalamar Creek Golf Club, Inc. ("Schalamar Golf Club"), a Florida corporation since 1986 (*dissolved September 26, 2014*), which operated in Polk County, Florida at 361 Denton Ave., Auburndale, Florida.

d.      Knapp is a Director, and former President of Schalamar Creek Mobile Home Sales, Inc., a Florida corporation since 1986 (*dissolved September 25, 2009*), which operated in Polk County, Florida at 4500 U.S. Highway 92 East, Suite 1030, Lakeland, Florida 33801.

e.      Knapp is a General Partner to Schalamar Creek Golf & Country Club Community, Ltd., a Florida limited partnership which operated in Polk County, Florida since 1999 (*dissolved September 22, 2017*) at 361 Denton Ave., Auburndale, Florida.

38.      At all times material, Knapp was the "mobile home park owner" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Knapp was also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been

delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.9   Julie Jennings, f/k/a Julie Knapp ("Jennings")

39.     Defendant Julie Jennings, f/k/a Julie Knapp ("Jennings") is an individual who currently resides in Polk County, Florida at 5534 Old Berkley Rd., Auburndale, Florida.

40.     Jennings is the sister of Defendant Knapp and the owner and Secretary of Defendant J & J Sanitation Services, Inc., along with her husband and President of the corporation, Thomas Jennings. Jennings, J & J Sanitation, and Thomas Jennings are the beneficiaries of a long-term multi-year million dollar contract gifted by Knapp to Jennings, J & J Sanitation, and Thomas Jennings for the exclusive provision of trash pick-up in Schalamar Creek Golf Mobile Home Park and paid for by the elderly homeowners in perpetuity.

### 4.2.10  J & J Sanitation Services, Inc. ("J & J Sanitation")

41.     Defendant J & J Sanitation Services, Inc. ("J & J Sanitation") is a Florida corporation which operates in Polk County, Florida, at 5534 Old Berkley Rd., Auburndale, Florida.

42.     J & J Sanitation Services, Inc., is owned and operated by Defendant Jennings, the sister of Defendant Knapp, and her husband and President of the corporation, Thomas Jennings. J & J Sanitation, Jennings, and Thomas Jennings are the beneficiaries of a long-term multi-year million dollar contract gifted by Knapp to J & J Sanitation, Jennings, and Thomas Jennings for the exclusive provision of trash pick-up in Schalamar Creek Golf Mobile Home Park and paid for by the elderly homeowners in perpetuity.

**4.2.11  Osprey Links, LLC ("Osprey Links")**

43.     Defendant Osprey Links, LLC ("Osprey Links"), f/k/a Osprey Links
Joint Venture (a Florida general partnership), is a subsidiary of Defendant Northwestern
Mutual, and is a converted Foreign (Delaware) limited liability company since 2008 at
720 East Wisconsin Ave., Milwaukee, Wisconsin. Its Managing Member is NM Imperial,
LLC, a Foreign (Delaware) limited liability company since 2005, and Brady, Inc., f/k/a RE
Corp., a Foreign (Delaware) corporation since 1997: both operating at 720 East Wisconsin
Ave., Milwaukee, Wisconsin.

44.     "Osprey Links" is the "mobile home park owner" of Schalamar Creek
Golf Mobile Home Park, as defined by § 723.003(13), *Fla. Stat.,* which includes an
"owner" or "operator." Osprey Links is also an "operator" of Schalamar Creek Golf
Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been
delegated the authority to act as the park owner in matters relating to the administration
and management of the mobile home park, including, but not limited to, authority
to make decisions relating to the mobile home park." Osprey Links is a "person" as
defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations,
joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries,
corporations, and all other groups or combinations." "The singular includes the plural
and vice versa." §1.01(1), *Fla. Stat.*

**4.2.12  Schalamar GP, Inc. ("Schalamar GP")**

45.     Defendant Schalamar GP, Inc. ("Schalamar GP"), is a Florida corporation
since 1999 (dissolved September 22, 2017), which operated in Polk County, Florida at 361
Denton Ave., Auburndale, Florida. The corporation was capitalized with 1,000 shares of
common stock at $1.00 par value per share or a total, of $1,000.00.

46.     Schalamar GP is the "mobile home park owner" of Schalamar Creek
Golf Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an

"owner" or "operator." Schalamar GP is also an "operator" of Schalamar Creek Golf Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Schalamar GP is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.13  Richard Lee ("Lee")

47.     Defendant Richard Lee ("Lee") is an individual who currently resides in Leon County, Florida. Lee is a licensed Florida lawyer since 1980, a partner and/or an employee or shareholder of Defendant Lutz, Bobo & Telfair, P.A., d/b/a Lutz, Bobo, Telfair, Eastman & Lee, 2155 Delta Blvd., Suite 201B, Tallahassee, Florida. Lee, a partner and/or principal of Lutz Bobo Law Firm, is a founding or participating member and lobbyist for the FMHA.

### 4.2.14  David Eastman ("Eastman")

48.     Defendant David Eastman ("Eastman") is an individual who currently resides in Leon County, Florida. Eastman is a licensed Florida lawyer since 1990, a partner and/or an employee or shareholder of Defendant Lutz, Bobo & Telfair, P.A., d/b/a Lutz, Bobo, Telfair, Eastman & Lee, 2155 Delta Blvd., Suite 201B, Tallahassee, Florida. Eastman, a partner and principal of Lutz Bobo Law Firm, is General Counsel and a founding member and lobbyist for the FMHA.

**4.2.15  Lutz, Bobo & Telfair, P.A. ("Lutz Bobo Law Firm")**

49.     Defendant Lutz, Bobo & Telfair, P.A. ("Lutz Bobo Law Firm"), d/b/a Lutz, Bobo, Telfair, Eastman & Lee, f/k/a Lutz, Webb & Bobo, P.A., is a Florida corporation which operates in Leon County, Florida at 2155 Delta Blvd., Suite 201B, Tallahassee, Florida and in Sarasota County, Florida at One Sarasota Tower, Two North Tamiami Trail, Fifth Floor, Sarasota, Florida. Lutz Bobo Law Firm is a founding member and lobbyist for the FMHA. Lutz Bobo Law Firm is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

**4.2.16        Florida Manufactured Housing Association, Inc. ("FMHA")**

50.     Defendant Florida Manufactured Housing Association, Inc. ("FMHA") is a Florida corporation which operates in Leon County, Florida at 1284 Timberlane Rd., Tallahassee, Florida and throughout Florida. FMHA is a representative and an agent of the Defendants. Eastman, a partner and principal of Lutz Bobo Law Firm, is General Counsel and a founding member and lobbyist for the FMHA. FMHA is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

**5.0    Class Representation Allegations**

51.    Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to *Fed. R. Civil P.* 23.

52.    The proposed Class consists of all persons who are or were mobile homeowners in the Schalamar Creek Golf Mobile Home Park from 2009 to the present and have identical, or substantially similar underlying mobile home lot rental agreements with identical or substantially similar restrictions or sub-parts requiring, *inter alia*:

- the forced surrender of the Plaintiff homeowners' resale purchasers' right to assume the resale sellers' less expensive lot rental prospectus (denoted P1 through P5) and instead require the Plaintiff homeowners to assume and adopt a later P6 prospectus requiring significantly higher lot rental and an increased rent escalation percentage, and causing a $10,000 to $15,000 reduction in resale value;

- payment by the Plaintiff homeowners of fraudulent, excessive, and improperly calculated ad valorem tax pass-ons resulting from the fraudulent 2011 sale and purchase of the Park by the Defendants and currently illegal and fraudulent inclusion of ad valorem tax pass-ons related to income producing portions of the Park clubhouse, a bank, a restaurant, and RV storage lot;

- direct-billed annual payment by the Plaintiff homeowners of perpetual sanitation costs to Defendant Jennings, Defendant Knapp's sister and her family-owned corporation, J & J Sanitation Services, as a condition of home ownership.

53.    The Class includes those Plaintiffs who have been forced or expect to be forced to be fraudulently required to surrender of the resale purchasers' right to assume the resale sellers' pre-existing prospectus.

54.    The Class includes those Plaintiffs who have suffered retaliation or expect to suffer retaliation by the Defendants as a result of their and their Schalamar HOA's criticism of the Defendants' insistence that all listing or purchasing homeowners assume and adopt the P6 prospectus.

55.    The Class includes those Plaintiffs who have paid the excessive ad valorem

pass-ons and the perpetual sanitation costs or who received threats of liens or eviction or restrictions of their use of Park facilities or amenities for their nonpayment.

56.     The Class includes those elderly and disabled Plaintiff homeowners who have suffered the deprivation or expect to suffer the deprivation of a handicap accessible Park clubhouse, facilities, golf course, and common areas.

57.     Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that market or sell homes in Schalamar Creek Golf Mobile Home Park, the judge(s) assigned to this case, and the attorneys of record in this case. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

58.     This action is properly brought as a class action because:

        (a)     The proposed Class is so numerous and geographically dispersed throughout the United States and Canada that the joinder of all Class Members is impracticable. The number of Class members is approximately 1,000 persons, and is expected to grow as homes in Schalamar Creek Golf Mobile Home Park are resold. Many of the Class Members are seasonal residents of Florida and reside in other portions of the United States and Canada during the remainder of the year;

        (b)     The disposition of Plaintiffs' and proposed Class Members' claims in a class action will provide substantial benefits to both the parties and the Court;

        (c)     The proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same or similar fashion and uniform manner;

        (d)     There are questions of law and fact common to the proposed Class which predominate over any questions that may affect particular Class Members. Such common questions of law and fact include but are not limited to:

1.   Whether Defendants violated 18 U.S.C. § 1962;

2.   Whether Defendants violated Title 3 of the ADA - 42
     U.S.C. § 12181 *et seq.*;

3.   Whether Defendants violated the Florida Mobile Home
     Act, Chapter 723, *Fla. Stat.*;

4.   Whether Defendants violated the Florida Deceptive and
     Unfair Trade Practices Act (FDUTPA), Part II, Chapter
     501, *Fla. Stat.*;

5.   Whether Plaintiffs and Class Members have been harmed
     and the proper measure of relief;

6.   Whether Plaintiffs and Class Members are entitled to an
     award of treble damages, punitive damages, attorneys' fees
     and costs; and

7.   Whether, Plaintiffs and Class Members are entitled to
     equitable relief, and if so, the nature of such relief.

(e)   Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and Class Members have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all Class Members and are based on the same legal theories;

(f)   Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interests antagonistic to those of the other Class Members, and Plaintiffs have retained an attorney experienced in consumer class actions and complex litigation as counsel;

(g)   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

1.   Given the size of individual Class Members' claims and
     the expense of litigating those claims, few, if any, Class
     Members could afford to or would seek legal redress

individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

2.     This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered and uniformity of decisions will be insured;

3.     Without a class action, Class Members will continue to suffer damages, and Defendants' violations of law will proceed without remedy while Defendants continue to reap and retain the proceeds of their wrongful conduct; and

4.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude class certification.

59.     Defendants and their agents had, or have access to, address information for the Class Members, which may be used for the purpose of providing notice of the class action.

60.     Plaintiffs seek damages, equitable relief, attorneys' fees, and costs on behalf of the Class on grounds generally applicable to the entire proposed Class.

**6.0    The Scheme:**

**Since 2015, the Defendants deceived over 250 elderly mobile home resellers and purchasers into surrendering their statutory rights to assume the resale sellers' existing prospectus. The Defendants instead required the substitution of a new prospectus resulting in a significantly higher lot rental, ad valorem tax pass-ons, and $10,000 to $15,000 reduction in resale value**

61.      In early April 2011, Defendants Adler, Knapp, and Murex Properties announced the intended purchase of the Schalamar Creek Golf Mobile Home Park and entities owned by Knapp through Northwestern Mutual's Florida subsidiary, Defendant Osprey Links, for $57.7 million. On April 18, 2011 during a meeting between Defendant Adler, John Jacobs (described as a long-term friend of Adler and/or Knapp), and a Director of Field Production for the investment arm of Defendant Northwestern Mutual, Adler, Jacobs, and Knapp represented to the Plaintiff Schalamar HOA that the purchase of Schalamar Creek Golf Mobile Home Park and adjacent private golf course had been arranged through an "unsolicited offer" (the consequence of which purportedly frustrated the Schalamar HOA's statutory right of first refusal to match the contract terms and conditions under § 723.071(1). During the April 18, 2011 meeting Adler and Jacobs represented to the Schalamar HOA that Adler, Murex Properties and Northwestern Mutual agreed that they would not change the prospectus for existing residents.

62.      On March 3, 2011 - immediately before the announced sale of the Park - Defendants Knapp, Schalamar GP, Schalamar Creek Golf Club, Inc., and Schalamar Creek Golf & Country Club Community, Ltd., contracted through 2021 and automatically extending beyond 2021 to require perpetual payment by Plaintiffs for Park-wide trash pick-up and sanitation costs to Defendant Knapps' sister, Jennings, and her family corporation, J & J Sanitation. From 2011 through the date of this filing, in an apparent back-handed "sweetener" deal with Adler, Murex Properties, and Northwestern Mutual to the benefit

of Knapp, Jennings, and her family corporation, J & J Sanitation—and to the detriment of the Plaintiffs—the Defendants continue to require payment of monthly fees to J & J Sanitation. Since 2016 J & J Sanitation has eliminated seasonal vacation mode discounts, causing seasonal homeowners to pay for trash pick-up even in those months when they are not residing in the Park.

63.     J & J Sanitation's contract with the Defendants requires twice weekly trash pickup, including bulk items such as refrigerators and furniture. J & J Sanitation's subcontractor Republic Services currently refuses to pick up any trash or items that is not in the trash bin. Murex Properties has taken no action to mitigate the breach of the contract or bring J & J Sanitation into compliance. Murex Properties does issue letters of rule violation with threats of eviction to Plaintiff homeowners whom don't arrange their own private trash removal. Murex Properties has never given the Plaintiff homeowners a decrease in the lot rental amount corresponding to the forced private trash removal.

64.     In 2013, the Polk County Property Appraiser's Office raised the taxable value of Schalamar Creek Golf Mobile Home Park from $24. 9 million to $46. 9 million, an 88.4-percent increase. Dan Titus, a longtime resident of Schalamar Creek, was quoted in a February 13, 2013 Lakeland Ledger newspaper article that it amounts to about an $31-a-month increase in ad valorem tax pass-ons.

**6.1**   **The Florida Mobile Home Act recognizes the right of the resale mobile home purchaser to assume the remainder of the continuous or renewed term of the rental agreement between the mobile home park owner and the resale seller "… and shall be entitled to rely on the terms and conditions of the prospectus … as delivered to the initial recipient."**

65.   From 1986 to 2015, § 723.059(3) through (5), *Fla. Stat.*, "Rights of Purchaser" read as follows:

(3)   The purchaser of a mobile home who becomes a resident of the mobile home park in accordance with this section has the right to assume the remainder of the term of any rental agreement then in effect between the mobile home park owner and the seller and shall be entitled to rely on the terms and conditions of the prospectus or offering circular as delivered to the initial recipient.

(4)   However, nothing herein shall be construed to prohibit a mobile home park owner from increasing the rental amount to be paid by the purchaser upon the expiration of the assumed rental agreement in an amount deemed appropriate by the mobile home park owner, so long as such increase is disclosed to the purchaser prior to his or her occupancy and is imposed in a manner consistent with the initial offering circular or prospectus and this act.

(5)   Lifetime leases, both those existing and those entered into after July 1, 1986, shall be nonassumable unless otherwise provided in the lot rental agreement or unless the transferee is the home owner's spouse. The renewal provisions in automatically renewable leases, both those existing and those entered into after July 1, 1986, are not assumable unless otherwise provided in the lease agreement.

§ 723.059(3) through (5)

**6.2** **In 2015 Defendants Lee, Eastman, Lutz Bobo Law Firm, and FMHA intentionally corrupted statutory regulatory protections to mobile home owners when they lobbied, on behalf of themselves and the other Defendants, the Florida Department of Business and Professional Regulation and the Florida Legislature to amend § 723.059(5) to facilitate the surrendering of statutory rights to assume the remainder of the continuous or renewed term of the rental agreement between the mobile home park owner and the resale sellers**

66.     In 2015 Defendants Lee, Eastman, Lutz Bobo Law Firm, and FMHA lobbied, on behalf of themselves and the Defendants, the Division of Florida Condominiums, Timeshares, and Mobile Homes of the Florida Department of Business and Professional Regulation ("Division") and the Florida Legislature to amend § 723.059(5) to facilitate the surrendering of statutory rights to assume the resale sellers' existing prospectus (underline additions; strike-through deletions):

*** 

(5)     Lifetime leases **and the renewal provisions in automatically renewable leases**, both those existing and those entered into after July 1, 1986, **are not assumable** ~~shall be nonassumable~~ unless otherwise provided in the **mobile home** lot rental agreement or unless the transferee is the home owner's spouse. **The right to an assumption of the lease by a spouse may be exercised only one time during the term of that lease.** ~~The renewal provisions in automatically renewable leases, both those existing and those entered into after July 1, 1986, are not assumable unless otherwise provided in the lease agreement.~~

***

§ 7, Subsection 5, Ch. 2015-90, Laws of Florida (Effective July 1, 2015)

67.     Section 723.059(5), then, without proofing marks, currently reads:

\*\*\*

(5)     Lifetime leases and the renewal provisions in automatically

renewable leases, both those existing and those entered into after

July 1, 1986, are not assumable unless otherwise provided in the

mobile home lot rental agreement or unless the transferee is the

home owner's spouse. The right to an assumption of the lease by

a spouse may be exercised only one time during the term of that

lease.

\*\*\*

§ 7, Subsection 5, Ch. 2015-90, Laws of Florida (Effective July 1, 2015)

### 6.3    Defendants lied to the elderly Plaintiff homeowners that the newer P6 prospectus and its significantly higher lot rental would be required only for purchasers of new homes in the Park

68.     In various Park clubhouse meetings with the Schalamar HOA and the elderly Plaintiff homeowners during 2015 to 2016, Defendants Adler, DeMarco, Provost, Crook, Newkirk and Murex Properties informed them that the higher rent and expense P6 prospectus would only be issued to purchasers of new homes in the Park and not to purchasers of resale homes.

69.     In 2016 the Plaintiff Schalamar HOA and elderly homeowners learned that the P6 prospectus was actually being presented to resale home purchasers by Defendants Adler, DeMarco, Provost, Crook, Newkirk and Murex Properties as the only lawfully valid prospectus for any resale home in the Park.

70.     Crook (then a Vice President of Murex) stated at a 2016 weekly sales meeting in the Park Clubhouse in the presence of Murex Properties sales agent, Nick Van Lith and other Murex Properties sales agents or employees of the Murex Properties sales office that: "Our lawyers are not sure it's legal or ethical to change (to a P6), but we are going to do it anyway."

**6.4     Defendants required elderly resale home purchasers to assume the P6 prospectus by signing complicated "lease assumption" and "prospectus receipt" documents**

71.     The Defendants provided all elderly prospective resale homeowners with purportedly legal "assumption of lease" or other documents which had the effect of adoption of the P6 prospectus. The resale purchasers were hurriedly directed - with little or no explanation - to sign the documents which were prepared by Defendants Lee, Eastman, and Lutz Bobo Law Firm. (Exh. A is adopted**)**. These documents mischaracterize the existing lease as "expired" and the assumption of the P6 prospectus as a "new" lease. The Defendants told most elderly homeowners they had to assume or adopt the P6 prospectus in order to "transfer the lease" or even to list their home for resale with Murex Properties.

72.     Defendants Lee, Eastman, and Lutz Bobo Law Firm drafted and/or co-authored the assumption of lease and prospectus receipt documents used by the Defendants which incorporated fraudulent misrepresentations regarding the Plaintiffs' legal right to assume the resale seller's lower expense prospectus. Defendants Lee, Eastman, and Lutz Bobo Law Firm cloaked the forced surrender of the right to assume along with a feigned acceptance of the increased ad valorem tax pass-ons with an air of legitimacy. The documents were written in a dizzying and nearly incomprehensible use of legalese

73.     Defendants Adler, DeMarco, Provost, Crook, Newkirk and Murex Properties also require the prospective resale purchasers to sign an unnecessary and illegal "prospectus receipt" document prepared by Defendants Lee, Eastman, and Lutz Bobo Law Firm, which indicates much more than permitted by § 723.011(5), *Fla. Stat.*, including that the Schalamar HOA has "agreed" with the Defendants' interpretation of the P6 prospectus, its "binding" nature, its applicability to resale homes, and its incorporation of a provision authorizing ad valorem tax pass-ons. (Exh. A is adopted).

74.     The Park owner may request that the homeowner sign a receipt indicating that the homeowner has received a copy of the prospectus, and other documents clearly identified in the receipt. But, the receipt " ... shall indicate nothing more than that the documents identified herein have been received by the mobile home owner .... " § 723.011(5), *Fla. Stat*.

75.     Most elderly prospective resale homeowners were not provided with a copy of the P6 prospectus prior to or even contemporaneous with the execution of the lot rental agreement. Most were not provided a copy of the prospectus until weeks or months after closing. Many homeowners discovered that their forced adoption of the P6 prospectus caused a significantly higher lot rent, ad valorem tax pass-ons, and $10,000 to $15,000 reduction in the resale value of their homes.

**6.5    Defendants manipulated some elderly resale home purchasers to the higher rent P6 prospectus using "rent discount coupons," $250 incentive awards to resale sellers, and other incentives to adopt the P6**

76.     Defendants Adler, DeMarco, Provost, Crook, Newkirk, and Murex Properties misrepresented the proper resale prospectus and manipulated elderly prospective resale purchasers away from the lower rent and expense prospectus in favor of the higher expense P6 prospectus using multi-year "rent discount coupons," $250 cash incentive awards to resale sellers, and other incentives (i.e., golf shop or restaurant

coupons) to adopt the P6 prospectus.

77.     In 2015 to present Murex Properties policy was and is to pay a commission or bounty to a Murex Properties sales manager or property manager on each resale with an assumption or adoption of a P6 prospectus.

78.     Monthly lot rent discount coupons awarded by these Defendants as an incentive for the assumption of the P6 prospectus by prospective purchasers of resale mobile homes in the Park are typically multi-year, offering approximately $1,500 annual savings in lot rent and are executed in writing using a printed form titled "Schalamar Creek New Community Member Bonus Program - 2 Years Lot Rental Coupon "P6 Program - Lot Rent Coupon" and may indicate a completed checkbox for an additional $1,000 golf membership credit. (Exh. B is adopted)

79.     The Defendants typically offered a $250 gift card (redeemable in the Park restaurant or golf pro shop) to the prospective seller of a resale mobile home in the Park to "adopt" the P6 prospectus in advance of their sale. When questioned by the Plaintiff resale sellers about the propriety of imposing a significantly higher lot rent and expense prospectus the Defendants retort that the sellers should be unconcerned since the purchasers get rent discount coupons and golf membership credits.

### 6.6     Plaintiffs-homeowner scenarios: representative examples of Defendants' false statements and fraudulent omissions

80.     The Plaintiff Class Members were solicited by Defendants to visit and purchase mobile homes in the Park. Defendants intended to impress the elderly prospective home buyers by building a gated community and attendant facilities, including: a large clubhouse, a health and fitness center, pool, tennis courts, an adjacent private 18 hole golf course, and RV storage area.

81.     Most of the Plaintiff Class Members had experienced the home-buying process before. Some were new to the process. Regardless, everyone was made to feel

welcome by the superficially friendly sales staff at Schalamar Creek Golf Mobile Home Park. Most Plaintiff homebuyers report that there was a dizzying flurry of activity and paperwork (much of it in small type) or in legalese nearly indecipherable to laypersons.

### 6.6.1   JoRene Finkle

82.       JoRene Finkle purchased her home at Lot 363 in Schalamar Creek on June 15, 2017. She writes: "... Jerry Van Houten was my salesman and he was concerned only with the purchase of my new home. Although he was very attentive to showing me homes, he did not explain anything and seemed to have few details. The actual closing was held in two separate parts. The first part was with the sales office where I paid the money due. Nothing was explained to me other than the checks that needed to be provided. The second part I was sent over to Marti [Newkirk] for orientation, etc. This was where I had to sign all the legal documents which at this point, I had already paid the money in full, and had to sign whatever they put in front of me. [Newkirk] made a big sales presentation of how the P6 prospectus was the same as the previous ones and this was just the new one that everyone was required to sign. I had no opportunity to read the lengthy document and had to rely on her word that it was just something everyone had to sign. Actually as I remember, she sent me the document via email and I had to print it myself at home. I was not given any incentive to sign, was just told I had to do it.

"It was in talking to other residents that I learned that this was a mistake and that others were paying only $5.00 per month increase rather than a CPI increase which accounts to somewhere between $20-25 per month. This over a few years is a substantial increase to an already expensive lot rent which we receive nothing. I received a visit from the previous owners and they told me the story that the parents (not sure if it was mother or father) bequeathed the property to the daughter, and when the daughter took over the property from the original owner (who obviously had a much earlier version of the prospectus) was required to sign a new P6 to take ownership of the property given to her

by her mother. This was an original owner and suddenly the lot rent went very high to her daughter and when her daughter sold the property, the lot rent was very high to me. This original prospectus should have transferred over to not only her daughter but myself when it was purchased.

"In talking with some other new residents, they told me also that they WERE NOT required to sign the new P6 prospectus which infuriated me as it had been only a year and now obviously Murex has decided that it was doing wrong, and gave the new buyers the opportunity to take over older prospectus. It appears that they know they are in the wrong and have corrected it going forward, however, those of us who purchased in the last couple of years (not sure of the time frame) that we have been the object of a plan to increase lot rents substantially.

"I do know that some people were given incentives on lot rent which I was not offered as Jerry Van Houten told me it wasn't available on my property. Not sure why unless it was because of the transfer from the owner to daughter and she received the incentive...."

### 6.6.2   Doug Phillips

83.     Doug Phillips first came to Schalamar Creek in 2006. He purchased his home on Lot 395 for $92,000 and sold it April 20, 2017 for $62,000. On April 10, 2017, Newkirk told him that he was required to sign paperwork to "transfer the lease." Subsequently, he learned from a former sales agent for Murex Properties, Nick Van Lith, that he had been duped into surrendering his lesser cost P3 prospectus and imposing the more expensive P6 prospectus upon his resale purchaser, effectively reducing his resale value in the process. He later learned that rental discount coupons were provided to the resale purchaser as an inducement for the purchase.

### 6.6.3   Fred and Leanna Parsons

84.      Fred and Leanna Parsons owned their mobile home at Lot 415 Schalamar Creek for 27 years. In December 2016 they contacted Murex Home Sales and salesman Jerry Van Houten to list their house for sale. Van Houten attended and went over a price for the sale. Van Houten suggested a very high resale price: they settled upon a lower amount. Van Houten gave them an incentive to list with him: rental discount coupons to the buyer in the amount of $2,000. After signing the sales agreement, Van Houten asked them to see Marti Newkirk in the management office to sign a paper, which they thought was part and parcel for the listing of the home. Fred Parsons went. At that time Marti only again mentioned about the coupons for the lot rent for the new buyers and absolutely nothing about a 3% monthly lot rent being on the new prospectus. The form Fred signed only mentioned a new prospectus and nothing about a 3% monthly rate per year increase in lot rent to the new buyers. The Parsons never received a copy of the new P6 prospectus and were never asked to read same. The Parsons took their house off the market when the listing was over.

When they arrived back in October 2017 they decided to again list their house for sale. In the meantime they had heard rumors about this new P6 prospectus. They thought it would not involve them because their listing was over. They again contacted Van Houten in early January 2018 to talk to him about re-listing their house. They were shocked to hear that they were NOW locked into the new P6 prospectus as they had, apparently, assumed the P6 the previous year. Van Houten never once told them that this new prospectus would increase the lot rent by 3% to the new buyers. Also, he informed them that their new lot rent, which was $740.00 on the last listing, would now be $815.00 a month. They feel they were lied to and cheated when they signed with Murex Home Sales and Van Houten as listing agents. They think it will be next to impossible to sell their home at a decent price. They have been residents of Schalamar Creek for 27 enjoyable

years and this has left a "sour taste" in their mouths.

### 6.6.4   Patrick and Joette Kelly

85.      Patrick and Joette Kelly purchased their mobile home at 4659 Arlington
Park Drive in Schalamar Creek in January 2018. Their sales agent was Murex Properties
employee Jerry Van Houten. The closing was handled by Murex Properties employee
Cristal Abetrani. Abetrani rushed the closing and did not permit them to read the
documents. Murex Properties did provide one year of rental discount coupons. Murex
Properties never disclosed to the Kellys that they had a choice to assume the resale seller's
original P3 prospectus. They also did not explain why they being charged for 2017 ad
valorem tax pass-ons. In less than a year their $650 monthly lot rent rose to $720. When
they went to management to seek clarification, they were told the increase was because
of the expiration of their discount coupons. Within a month after purchase, they learned
that Van Houten had wrongly told them the house was a 1996 mobile home. In fact, the
title identified it as a 1990 home. Murex Properties and Van Houten have refused any
compensation for this misrepresentation.

### 6.6.5   Debra and Kevin McKenna

86.      Debra and Kevin McKenna purchased their mobile home at Lot 314
in Schalamar Creek on April 15, 2016. Their house was owned by several different
owners. One of previous owners lost the house to their bank for failure to meet their
mortgage payments. The McKennas were never told anything about a previous owner's
prospectus being available. They purchased their house through Murex Properties a
couple of days before they departed Florida to return to their home in Ontario. They
questioned Murex Sales representative, Nick Van Lith, about the house closing process
and he explained that they would not require a lawyer to close the sale of the house as
Murex Properties had a lady that looked after all the house closings. There would be no
issues with them being at home in Canada. Van Lith explained that it was like transferring

the ownership of a trailer. He suggested that they go to the Schalamar office and inquire if they could get the ownership package with the prospectus that they would need to sign before they left Florida.

After they signed the offer to purchase the home on March 28, 2016, they went to the Schalamar office in the clubhouse and requested to speak with Marti Newkirk. They were told by Crystal in the Schalamar office that Marti was not available. They asked Crystal to provide them the new ownership package with a copy of the prospectus before they departed March 31st. She indicated that it was not possible to receive the documentation before they departed. They asked if Schalamar would courier the package before the house closing date of April 15, 2016 and she said that she would check with Marti but she did not believe it would be ready before the closing date. The McKennas contacted Marti Newkirk and left voice messages for her to return their phone calls concerning receiving the ownership package. They also spoke with Crystal on a couple of occasions expressing their frustration over the number of unreturned phone messages to Marti and the failure to receive the ownership package from Schalamar. Marti Newkirk forwarded an email to them with several attachment on June 9, 2016. Newkirk wrote in her email that she previously mailed the package on April 18, 2016 (after the house closing date). Marti Newkirk signed the emailed prospectus in a couple of areas and in one of the areas the signature date is May 19, 2016. When the McKennas received the emailed documents they had a couple of questions and it took a couple of weeks to get responses from Marti via email.  After they signed the documents they returned them by priority post to Schalamar Creek on June 23, 2016 – more than two months after they took ownership of the property.

### 6.6.6   William Duke

87.     William Duke purchased his homes at Lots 302 and 782 in January 2017. Marti Newkirk insisted that he sign for the P6 prospectus on both homes. He noticed for Lot 782 that they provided him with a "Prospectus Not Presented." He doesn't remember Murex Properties providing that to him for Lot 302.

### 6.6.7   Johanna Kerman

88.     Eighty-eight year-old Johanna Kerman listed her home for sale by Murex Properties with Marti Newkirk in March 2017. Her daughter, Mary Irwin, was in town for a few days to help. They went to Murex sales office and were told they needed to sign papers with Newkirk before they could sell. Neither Johanna or Mary knew anything about a prospectus or what it was. Newkirk told Johanna that she could get $200 when she sold if she signed some papers in advance. Newkirk wrote the $200 figure in big letters at the bottom of the page. Johanna's face lit up at the offer, and readily signed. Johanna's daughter, Mary, didn't find out until later what that meant for buyers, and feels it put them at a great disadvantage when they tried to sell their house. Their house sold recently, but at a much reduced price because of the P6.

## 6.7   Defendants concealed public disclosure of the Scheme by threatening litigation against homeowners, instructing employees to never discuss the P6 prospectus

89.     Beginning in 2015 and continuing to the present, Murex Properties sales agents were and are instructed by Adler, DeMarco, Provost, Crook, Newkirk, and Murex Properties **to not discuss the P6 with either buyers or sellers.** Instead, sellers were to be referred to DeMarco, Provost, or Newkirk immediately, and they would "handle" them to get them to sign a P6 by:

- Convincing them to just sign "these" required documents to list their homes or;

- If they were reluctant, to offer them a form of incentive (cash, gift card,golf course membership, etc.) and to assure them that this did not affect the sale because the buyer was receiving rent discount "coupons" over a period of years.

90.     When questioned by the Plaintiff Schalamar HOA and elderly homeowners about the lawfulness or propriety of the P6 prospectus as applied to resale purchasers, the Defendants told the Plaintiffs to: "Mind your own business ... that is OUR business."

91.     When questioned by prospective resale purchasers about the assumption of existing lower rent and expense Pl, P2, P3, or P5 prospectuses, Adler, DeMarco, Provost, Crook, Newkirk, and Murex Properties told the purchasers that they were "simply" required to present the **original** signed copy of the earlier prospectus issued to the seller or the purchasers would not be allowed to assume the earlier prospectus.

**6.8     Mail and Wire Fraud**

92.     On or about June 23, 2017 Defendants Lee, Eastman, and Lutz Bobo Law Firm extorted, and subverted public disclosure of the Scheme by United States mail. They drafted, co-authored and/or authorized the communication by United States mail of a hostile, threatening, and extortionate letter to Schalamar Creek Golf Mobile Home Park homeowner and former Schalamar HOA board member, Russ Weiderman, intending to discourage public discussion in the Park of the illegal and fraudulent scheme in which the Defendants force Plaintiffs' resale purchasers to accept a new P6 prospectus with a significantly higher lot rental amount and ad valorem tax pass-on expense. (Exh. C is adopted)

93.     In their letter to Weiderman, Lee, Eastman, and Lutz Bobo Law Firm purportedly responded to critical assertions by Weiderman of Defendants' illegal forced adoption of the P6 prospectus in the May 2017 Schalamar HOA Summer Newsletter published and distributed to the other 1,000 mobile homeowners in the Park. Weiderman

criticized the Defendants for subverting the law:

> ... By law, the new prospectus should only be given to first time buyers of a <u>new home</u>. A new prospectus should not be given to a buyer purchasing a used home unless agreed to by the buyer and park management. This is a change to the current law which gives all buyers of used homes in parks like ours the right to assume the original prospectus that was assigned to the initial buyer of the house. This means that if the original buyer bought the house with a P5 or older prospectus you have the right as the new homeowner to assume the P5 or older prospectus as originally assigned by Schalamar Creek.

 (Exh. C)

94.     Lee, Eastman, and Lutz Bobo Law Firm accused Weiderman—a non-lawyer—of misstating the law:

> ... there is absolutely no legal basis for a claim that all buyers of used homes have "the right to assume the original prospectus that was assigned to the initial buyer of the house." You have misinterpreted the disclosure in section 723.059(3) regarding delivery of the prospectus of the initial recipient." The initial recipient is the initial home owner whose tenancy was governed by the prospectus which governs the present home owner's tenancy; it is most certainly not the prospectus given to the original owner of the home. **If a home owner accepts a new prospectus he is the initial recipient of that prospectus. Your interpretation would result in an unconstitutional perpetual tenancy.**

(Exh. C)(Emphasis Added)

95.     Lee, Eastman, and Lutz Bobo Law Firm further inaccurately and improperly wrote that:

> ... the park owner has the **legal right to preclude assumption of the automatically renewing provision** of that rental agreement and its incorporated prospectus. [Noting, by footnote, that: Pursuant to section 723.031(10) the prospectus is incorporated into the lot rental agreement.]

(Exh. C)(Emphasis Added)

96.     Finally, Lee, Eastman, and Lutz Bobo Law Firm threatened Weiderman with a lawsuit:

> The implication of your article is that Schalamar Creek is acting illegally. Be advised that ... verbal or written attacks or accusations concerning the park owner or park management which cannot be verified or which are made without knowledge of all of the facts relevant to the matters could be characterized as being made in reckless disregard of the truth. Any such statement as well as any knowingly false statement is potentially slanderous or libelous and may subject the offending resident to a lawsuit for damages suffered by the park owner. Such damages could include those arising from a lost sale and loss of subsequent rental payments arising from actions intended to disparage the park owner and/or management.

***

(Exh. C)

97.     Eastman is general counsel to FMHA. As general counsel he has authored and co-authored many articles for statewide publication on legal and regulatory issues of his and other attorneys′ mobile home park owner clients. Moreover, in their capacity as principals or employees in the Lutz Bobo Law Firm and in their individual capacities as Florida lawyers, Eastman and Lee have pursued legal action on behalf of FMHA and the FMHA membership for many years. In November 2018 Eastman authored a column in the statewide FMHA news which served as an artifice to mislead and deceive constituent members, including park owners, managers or operators, and their lawyers that they could use the ″opportunity″ in resales to cause the surrender of lower rental agreements and associated prospectuses (described facetiously as ″buttoning up″ the document file or ″setting the table″):

***

[Eastman - General Counsel's Comments:]

**The Sale of a Mobile Home Creates Opportunity for Community Management.**

Whenever a home owner sells his or her mobile home, community management should actively work on creating and establishing a good, well-informed relationship with the new owner. Not only can a new personal relationship be built, but it is also **an opportunity to button up the document file** and establish a new contractual relationship with the purchaser.

***

However, **one thing is quite clear: management needs to have the new home owner agree to the terms and conditions of the tenancy....**

The question of the delivery of a new prospectus and rental agreement are issues for Community Management to be aware of and **be extremely careful** to make the right decision. **Some existing prospectuses and rental agreements are assumable....**

***

... The general rule is that management should secure a signed rental agreement for the next rental period, regardless of whether or not the seller's rental agreement was assumed and a new prospectus delivered....

***

This transition time might be community management's best opportunity to **properly set the table** for long term success with each new resident. If you have questions about assumable rental agreements, prospectuses, or any portion of the transition of residents selling home, reach out to the FMHA or contact your local attorney.

(Exh. D is adopted)

98.     Lee, Eastman, and Lutz Bobo Law Firm's admonition that Weiderman's interpretation is one of an unconstitutional perpetual tenancy has been expressly rejected by the United States Supreme Court in *Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992). In *Yee*, the mobile home park owner argued that the remedial statute had effectively rendered the home owner:

Page 54

... to be a **perpetual tenant** of the park, and the increase in the mobile home′s value thus represents the right to occupy a pad at below-market rent indefinitely. And because the Mobilehome Residency Law permits the mobile home owner to sell the mobile home in place, the  mobile homeowner can receive a premium from the purchaser corresponding to this increase in value. The amount of this premium is not limited by the Mobilehome Residency Law or the Escondido ordinance. As a result, petitioners conclude, the rent control ordinance has transferred a discrete interest in land—the right to occupy the land indefinitely at a submarket rent—from the park owner to the mobile home owner. Petitioners contend that what has been transferred from the park owner to mobile home owner is no less than a right of physical occupation of the park owner′s land.

*Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992)(Emphasis Added)

99.     Justice O′Connor rejected the mobile home park owner′s argument,

however:

***

**This argument**, while perhaps within the scope of our regulatory taking cases, **cannot be squared easily with our cases on physical takings**. The government **effects a physical taking only where it requires the landowner to submit to the physical occupation of his land.** "This element of required acquiescence is at the heart of the concept of occupation." *FCC v. Florida Power Corp.*, 480 U.S. 245, 252, 107 S.Ct. 1107, 1112, 94 L.Ed.2d 282 (1987). Thus whether the government floods a landowner′s property, *Pumpelly v. Green Bay Co.,* 13 Wall. 166, 20 L.Ed. 557 (1872), or does no more than require the landowner to suffer the installation of a cable, *Loretto, supra*, the Takings Clause requires compensation if the government authorizes a compelled physical invasion of property.

But the Escondido rent control ordinance, even when considered in conjunction with the California Mobilehome Residency Law, authorizes no such thing. **Petitioners voluntarily rented their land to mobile home owners.** At least on the face of the regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so. To the contrary, the Mobilehome Residency Law provides that a park owner who wishes to change the use of his land may evict his tenants, albeit with 6 or 12 months notice. Cal.Civ.Code Ann. § 798.56(g). Put bluntly, no government has required any physical invasion of petitioners′ property. **Petitioners′ tenants were invited by petitioners, not forced upon them by the government.** *See Florida Power, supra*, 480 U.S. at 252–253, 107 S.Ct. at 1112–1113. While the "right to exclude" is doubtless, as petitioners

assert, "one of the most essential sticks in the bundle of rights that are commonly characterized as property," *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979), we do not find that right to have been taken from petitioners on the mere face of the Escondido ordinance.

***

On their face, the state and local laws at issue here merely regulate petitioners' use of their land by regulating the relationship between landlord and tenant. "**This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.**" *Loretto*, 458 U.S., at 440, 102 S.Ct., at 3178. *See also Florida Power, supra*, 480 U.S., at 252, 107 S.Ct., at 1112 ("statutes regulating the economic relations of landlords and tenants are not per se takings").

***

*Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992)(Emphasis Added)

100.    Defendants (and their co-conspirators/agents) engaged in a scheme to unlawfully defraud Plaintiffs of their money or property through the fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus. Defendants (and their co-conspirators/agents) knowingly devised or knowingly participated in a scheme or artifice to defraud Plaintiffs or to obtain the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, material omissions, or promises.

101.    Defendants (and their co-conspirators/agents) could foresee that the U.S. Postal Service and interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341 and 1343.

102.    In particular, Defendants (and their co-conspirators/agents) knew or could foresee that the U.S. Postal Service and interstate wires would be used to receive and/or deliver, *inter alia,* the assumption of lease and prospectus receipt documents used by

Page 56

the Defendants which incorporated fraudulent representations regarding the Plaintiffs' legal right to assume the resale seller's lower expense prospectus, invoices for payment of increased lot rental and payment of excessive ad valorem tax pass-ons from the sale and purchase of the Park and trash pick-up costs to the relatives of the Defendants, and the Defendants' announced attempted extortion of the Plaintiffs to amend the lot rental agreement to pay cableTV and Internet assessment as a pass-on for the next five years.

103.   Defendants (and their co-conspirators/agents) acting singly and in concert, personally or through their agents, used the U.S. Postal Service and interstate wires or caused the U.S. Postal Service or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud the Plaintiffs within the meaning of 18 U.S.C. §§ 1341 and 1343.

104.   It is not possible for Plaintiffs to plead with particularity all instances of mail and wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Defendants (and their co-conspirators/agents) other presently unknown individuals.

105.   By way of example, however, Defendants (and their co-conspirators/ agents) specifically used the U.S. Postal Service or interstate wires or caused the U.S. Postal Service or interstate wires to deliver each and every telephone call, email, and letter described in paragraphs (supra, ¶¶ 71-110).

106.   Upon information and belief, some of the wire communications described above occurred between persons in the same state but crossed interstate borders by reason of the technology and other mechanisms used to transmit the communication.

107.   Each and every use of the U.S. Postal Service or interstate wires described above was committed by Defendants and their co-conspirators/agents with the specific intent to defraud Plaintiffs or for obtaining the money or property of Plaintiffs by means

of false or fraudulent pretenses, representations, material omissions or promises. Defendants and their co-conspirators'/agents' acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B) or "criminal activity" as defined by *Fla. Stat.* § 772.102(b).

108.    Plaintiffs purchased their mobile homes and entered into a long-term lot rental agreement not knowing that the Defendants fraudulently forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus, and they were forced to pay a higher lot rental, ad valorem tax pass-on, and suffer significant reduction in their resale value.

109.    Defendants' scheme to defraud was designed to victimize elderly homebuyers. As such, Defendants intended to take advantage of Plaintiffs' perceived ignorance or gullibility and intended to prey on Plaintiffs' infirmities.

110.    Defendants' scheme further deprives the Plaintiffs of their intangible right to honest services under The Florida Mobile Home Act, in which the mails were caused to be used to defraud and deceive the Plaintiffs through materially false and fraudulent misrepresentations and omissions. The Plaintiffs and Defendants have a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise. The relationship need not be a formal, or classic, fiduciary relationship. Rather, courts have concluded that 18 U.S.C. §§ 1341 and 1346 similarly reach those who assume a comparable duty of loyalty, trust, and confidence, the material breach of which, with the intent to defraud, deprives the victim of the intangible right to honest services. *U.S. v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012), *cert. den.*, 568 U.S. 1126 (2013).

**6.9    Extortion**

111.    Defendants obstructed, delayed, or affected commerce and/or the movement of articles or commodities in commerce, by extortion or attempted or conspired to do so in violation of 18 U.S.C. § 1951.

112.    Defendants maliciously threatened an injury to Plaintiffs' property or reputation with intent thereby to extort money or pecuniary advantage or with intent to compel Plaintiffs to act or refrain from acting against their will in violation of *Fla. Stat.* § 836.05.

113.    Defendants obtained or attempted to obtain money and property from Plaintiffs, with their consent, induced by wrongful use of actual or threatened fear. In particular, Co-Defendants Lee, Eastman, and Lutz Bobo Law Firm, drafted or caused Lee and/or Eastman and/or Lutz Bobo Law Firm to author, co-author, and/or authorize to communicate via United States mail a hostile and threatening June 23, 2017 letter to Schalamar Creek Golf Mobile Home Park homeowner and outgoing Schalamar HOA Board member, Russ Weiderman, and in that letter wrote that Weiderman's statement that the Defendants were engaged in illegalities could result in a lawsuit for damages which could include loss of rental income from other homeowners' reaction to his statements:

> ***
>
> Any such statement as well as any knowingly false statement is potentially slanderous or libelous and may subject the offending resident to a lawsuit for damages suffered by the park owner. Such damages could include those arising from a lost sale and loss of subsequent rental payments arising from actions intended to disparage intended to disparage the park owner and/or management.
>
> ***

(Exh. C)

114.     In 2002 Defendant Lee was sued in Osceola County, Florida by 41 elderly and/or disabled homeowners for violations of the Florida RICO and Florida RICO Conspiracy, Chapter 895, *Fla. Stat.*, Theft and Civil Remedies for Theft, §§812.014, 812.035, and 772.104, *Fla. Stat.*, and Florida Deceptive and Unfair Trade Practices Act, Chapter 501, *Fla. Stat.* The amended complaint alleged that on January 11, 2002 the defendants caused their attorney and agent, Lee, to come to the Park to extort the plaintiffs into abandoning their efforts to file suit in this cause, in violation of §§ 812.014, 836.05 and Chapter 895, *Fla. Stat.* Defendant Lee, at the request of the Park Owner, addressed the Plaintiffs and other individual home owners in the Park strongly urging them to abandon their plans for litigation. In the process of addressing the home owners, Defendant Lee purported to give the assembled home owners "legal advice" that their anticipated lawsuit had no chance of success and that the home owners would be forced to compensate the Park Owner it's substantial attorney fees. Numerous residents expressed to Defendant Lee that they felt his presence was an attempt to intimidate and frighten them. The case was settled and dismissed in February 2003.

115.     Defendants obtained or attempted to obtain money and property from Plaintiffs, with their consent, induced by wrongful use of actual or threatened fear. In particular, Defendants Adler, Murex Properties, and Northwestern Mutual in July 2018 extorted and attempted to coerce the Plaintiff Schalamar HOA into entering into an agreement to effect a hurried amendment to the existing prospectuses to require all of the homeowners in the Park to pay an ever-increasing sum for five years of cableTV and Internet services. Defendant Adler acknowledged that he or Murex Properties and Northwestern Mutual would receive a per "door" fee (standardly set at $100 to $150 per home, totaling in excess of $120,000) for securing the contract, which needed to be signed quickly so that notices could go out to all the homeowners. Finally, while recognizing that some impoverished elderly homeowners might reject the proposed deal, he threatened

that the Board would suffer the wrath of the majority if the Board rejected the proposal

out of concern for the minority of impoverished elderly homeowners:

*\*\*\**

Adler: ... let's say, do we really want to...? I say "we," because you're going to sign off on this, OK? Do we as a community really want to impact them, you know, is it worth it? So, you know, on the other hand, the flipside of it is if I can save 35 percent of the community, or more $100 a month, that's got to be a positive thing also, OK?

*\*\*\**

Adler: It's the same kind of thing to us, **I mean we're not making money on it, obviously.**

Jim Driskell: **You don't get a front-end door fee?**

Adler: **Yes.**

*\*\*\**

Male: The biggest issue I've got in my mind is the fact that we're basically imposing another cost on our residents that, you know, unfortunately, there are a lot of people in here who may be widowed, etc., who are on a fixed budget. And, you know, you're adding another $40 [clears throat] a month to them unilaterally without really getting their full buy-in.

*\*\*\**

Adler: **So it still falls back on us and the board where the decision needs to be made, OK? And it's, you know, they're going to say...**

*\*\*\**

Adler: I'm bringing this to you as a way that I think it benefits a lot of people, and saves a lot of money. Things like that.

*\*\*\**

**So, I'm just saying, you know, I guess a flip of it is a bunch of people [inaudible] , and if 700 people realize they can save $100 a month, OK, and *we say, "No,"* *how much fun is that going to be?*** (Emphasis Added)

*\*\*\**

116.     Defendants' attempted extortion was designed to manipulate and victimize elderly home owners into embracing an illegal and unilateral nonconsensual amendment to the prospectuses of the entire Park of elderly homeowners to benefit the majority of homeowners and the detriment of impoverished homeowners. As such, Defendants intended to take advantage of Plaintiffs' perceived ignorance or gullibility and intended to prey on Plaintiffs' infirmities.

**7.0     Claims**

**7.1     Count One – RICO; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(c) – *Fla. Stat.* § 772.103(3) by Defendants Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman

### 7.1.1     *Adler-DeMarco-Provost-Crook-Newkirk-Knapp-Jennings-Lee-Eastman Enterprise*

117.     Plaintiffs reallege and restate paragraphs 1 through 116.

118.     Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Adler-DeMarco-Provost-Crook-Newkirk-Knapp-Jennings-Lee-Eastman Enterprise*").

a.     Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman shared the common purposes of developing Schalamar Creek Golf Mobile Home Park and defrauding Plaintiffs of money or property through the fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus.

b.    Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman were related in that they are business partners and/or associates and owed to Plaintiffs a duty of good faith and fair dealing under § 723.021, *Fla. Stat.*

c.    The *Adler-DeMarco-Provost-Crook-Newkirk-Knapp-Jennings-Lee-Eastman Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Adler-DeMarco-Provost-Crook-Newkirk-Knapp-Jennings-Lee-Eastman Enterprise* existed from 2009 through 2019 (at a minimum).

d.    Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Adler-DeMarco-Provost-Crook-Newkirk-Knapp-Jennings-Lee-Eastman Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 92 to 110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

### 7.1.2   Alternative 1: *Murex Properties Enterprise*

119.    In the alternative to paragraph 118, between 2009 and 2019 (at a minimum), Murex Properties constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

         a.    Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of Murex Properties through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1) (b) (described in paragraphs 92 to 110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

### 7.1.3   Alternative 2: *Schalamar Mobile Home Park Enterprise*

120.    In the alternative to paragraphs 118 and 119, Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Schalamar Mobile Home Park Enterprise*").

a.   Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA shared the common purposes of defrauding Plaintiffs of money or property through the use of the fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus.

b.   Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA were related in that they are all alter egos of Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman.

c.   The *Schalamar Mobile Home Park Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Schalamar Mobile Home Park Enterprise* existed from 2009 through 2019 (at a minimum).

d.   Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Schalamar Mobile Home Park Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 92 to 110), and

extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

### 7.1.4    Alternative 3: *Lee Enterprise*

121.    In the alternative to paragraphs 118 and 119, between 2009 and 2019 (at a minimum), Lee was an individual who constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3).

    a.    Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of Lee through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 92 to 110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

### 7.1.5    Alternative 4: *Lutz Bobo Law Firm Enterprise*

122.    In the alternative to paragraphs 118 and 119, between 2009 and 2019 (at a minimum), the Lutz Bobo Law Firm constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

a.  Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the Lutz Bobo Law Firm through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 92 to 110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

**7.1.6    Alternative 5: *DBPR-Florida-Legislature Enterprise***

123.    In the alternative to paragraphs 118 and 119, between 2009 and 2019 (at a minimum), the Division of Florida Condominiums, Timeshares, and Mobile Homes of the Florida Department of Business and Professional Regulation and the Florida Legislature (*"DBPR-Florida-Legislature Enterprise"*) constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

a.  Adler, Lee, and Eastman are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *DBPR-Florida-Legislature Enterprise* through a pattern of racketeering activity or criminal activity

within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c)

and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern

of racketeering activity or criminal activity consisted of, but was

not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341,

1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 92 to

110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as

described in paragraphs 111 to 116).

124.    At all relevant times, the enterprises alleged in paragraphs 111 through 116

(supra) were engaged in, and their activities affected, interstate commerce and foreign

commerce.

125.    All of the acts of racketeering/crime described in paragraphs 92 to 110

and 111 to 116 were related so as to establish a pattern of racketeering activity or criminal

activity, within the meaning of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), in that their

common purpose was to defraud Plaintiffs of money and property through the use of the

fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale

sellers' prospectus; Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and

Eastman, personally or through their agent or agents, directly or indirectly, participated in

all of the acts and employed the same or similar methods of commission; Plaintiffs were

the victims of the acts of racketeering/crime; and/or the acts of racketeering/crime were

otherwise interrelated by distinguishing characteristics and were not isolated events.

126.    All of the acts of racketeering described in paragraphs 92 to 110 and 111

to 116 were continuous so as to form a pattern of racketeering activity in that Adler,

DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman engaged in the

acts of racketeering/crime over a substantial period of time (i.e., from 2009 through 2019)

and in that the acts of racketeering/crime have become the regular way in which Adler,

DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman do business and,

thus, threaten to continue indefinitely.

127.    As a direct and proximate result of, and by reason of, the activities of Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman, and their conduct in violation of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.104(1). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees and reasonable experts' fees.

**7.2    Count Two – RICO; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(c) – *Fla. Stat.* § 772.103(3) by Defendants
Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP,
J & J Sanitation, Lutz Bobo Law Firm, and FMHA

128.    Plaintiffs reallege and restate paragraphs 1 through 116.

### 7.2.1    *Corporate Enterprise*

129.    Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Corporate Enterprise*").

a.   Murex Properties, Northwestern Mutual, Osprey Links, Schalamar
     GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm,
     and FMHA shared the common purposes of developing Schalamar
     Creek Golf Mobile Home Park and defrauding Plaintiffs of money
     or property through the use of the fraudulent forced surrender of
     the Plaintiffs' resale purchasers' right to assume the resale sellers'
     prospectus;

b.   Murex Properties, Northwestern Mutual, Osprey Links, Schalamar
     GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm,
     and FMHA were related in that they are all controlled by Adler,
     DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and
     Eastman, who owe to Plaintiffs a duty of good faith and fair dealing
     under § 723.021, *Fla. Stat.*

c.   The *Corporate Enterprise* possessed sufficient longevity for the
     members to carry out their purpose(s) in that the *Corporate
     Enterprise* existed from 2009 through 2019 (at a minimum).

d.   Murex Properties, Northwestern Mutual, Osprey Links, Schalamar
     GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm,
     and FMHA are each a "person," within the meaning of 18 U.S.C.
     §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually
     conducted, participated in, engaged in, and operated and managed
     the affairs of the *Corporate Enterprise* through a pattern of
     racketeering activity or criminal activity within the meaning of 18
     U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1),
     772.102(4) & 772.103(3). Said pattern of racketeering activity or
     criminal activity consisted of, but was not limited to, the acts of

Page 70

mail and wire fraud (as described in paragraphs 92 to 110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

### 7.2.2   Alternative 1: *Murex Properties Enterprise*

130.    In the alternative to paragraph 129, between 2009 and 2019 (at a minimum), Murex Properties constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

a.    Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of Murex Properties through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 92 to 110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 105 to 10).

### 7.2.3    Alternative 2: *Schalamar Mobile Home Park Enterprise*

131.    In the alternative to paragraphs 129 and 130**,** Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in "fact" (hereinafter referred to as the "*Schalamar Mobile Home Park Enterprise*").

    a.    Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA shared the common purposes of defrauding Plaintiffs of money or property through the use of the fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus.

    b.    Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA were related in that they are all alter egos of Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman.

    c.    The *Schalamar Mobile Home Park Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Schalamar Mobile Home Park Enterprise* existed from 2009 through 2019 (at a minimum).

    d.    Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla*. *Stat*. § 772.103, who individually

conducted, participated in, engaged in, and operated and managed

the affairs of the *Schalamar Mobile Home Park Enterprise* through

a pattern of racketeering activity or criminal activity within the

meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla.

Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of

racketeering activity or criminal activity consisted of, but was not

limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343

and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 92 to

110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as

described in paragraphs 111 to 116).

### 7.2.4   **Alternative 3: *Lee Enterprise***

132.     In the alternative to paragraphs 129 and 130, between 2009 and 2019, Lee

was an individual who constituted an "enterprise," within the meaning of 18 U.S.C. §§

1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3).

a.     Murex Properties, Northwestern Mutual, Osprey Links, Schalamar

GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm,

and FMHA are each a "person," within the meaning of 18 U.S.C.

§§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually

conducted, participated in, engaged in, and operated and managed

the affairs of Lee through a pattern of activity or criminal activity

within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and

*Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of

racketeering activity or criminal activity consisted of, but was not

limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343

and *Fla. Stat.* §§ 772.102(1)(b)(as described in paragraphs 92 to

110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

### 7.2.5   Alternative 4: *Lutz Bobo Law Firm Enterprise*

133.    In the alternative to paragraphs 129 and 130 between 2009 and 2019 (at a minimum), the Lutz Bobo Law Firm constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

    a.    Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the Lutz Bobo Law Firm through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 92 to 110, and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

### 7.2.6   Alternative 5: *DBPR-Florida-Legislature Enterprise*

134.   In the alternative to paragraphs 129 and 130 between 2009 and 2019 (at a minimum), the Division of Florida Condominiums, Timeshares, and Mobile Homes of the Florida Department of Business and Professional Regulation and the Florida Legislature ("*DBPR-Florida-Legislature Enterprise*") constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

  a.   Murex Properties, Lutz Bobo Law Firm, and FMHA are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *DBPR-Florida-Legislature Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 92 to 110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

135.   At all relevant times, the enterprises alleged in paragraphs 129 through 134 (supra) were engaged in, and their activities affected, interstate commerce and foreign commerce.

136.   All of the acts of racketeering described in paragraphs 92 to 110 and 111 to 116 were related so as to establish a pattern of racketeering activity or criminal activity, within the meaning of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), in that their

common purpose was to defraud Plaintiffs of money and property through the use of fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus, their common result was to defraud Plaintiffs of money and property through the use of fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus; Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

137.    All of the acts of racketeering described in paragraphs 92 to 110 and 111 to 116 were continuous so as to form a pattern of racketeering activity in that Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA engaged in the acts of racketeering/ crime over a substantial period of time (i.e., from 2009 through 2019) and in that the acts of racketeering/crime have become the regular way in which Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA do business and, thus, threaten to continue indefinitely.

138.    As a direct and proximate result of, and by reason of, the activities of Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA and their conduct in violation of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.104(1). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP,

Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA; to the extent

Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property

that were fraudulently made by Murex Properties, Northwestern Mutual, Osprey Links,

Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA;

and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and

only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the

damages they sustained together with costs, reasonable attorneys' fees, and reasonable

experts' fees.

**7.3**   **Count Three – RICO; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(d) – *Fla. Stat.* § 772.103(4) by Defendants Adler,
DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman

139.     Plaintiffs reallege and restate paragraphs 1 through 116.

140.     As alleged in Count One, one or more of the following individuals

violated 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3): Adler, DeMarco, Provost, Crook,

Newkirk, Knapp, Jennings, Lee and Eastman. Any of these person(s) who violated 18

U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3) are referred to as the "Violator(s)" for the

remainder of this Count.

141.     Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or

Eastman, conspired with the Violator(s) to conduct or participate, directly or indirectly,

in the conduct of the affairs of the enterprises (*supra***, ¶¶** 118-123) through a pattern of

racketeering activity or criminal activity (*see* 92 to 110 and 111 to 116) in violation of 18

U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Adler, DeMarco, Provost,

Crook, Newkirk, Knapp, Jennings, Lee and Eastman intended to further an endeavor

of the Violator(s) which, if completed, would satisfy all of the elements of a substantive

RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the

goal of furthering or facilitating the criminal endeavor.

142.    Plaintiffs were injured by Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman's overt acts that are acts of racketeering/crime or otherwise unlawful under the RICO statute, which included (among other acts) mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 92 to 110), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116).

143.    As a direct and proximate result of, and by reason of, the activities of Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or Eastman, and their conduct in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.104(1). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or Eastman; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or Eastman; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.4**  **Count Four – RICO Conspiracy; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(d) – *Fla. Stat.* § 772.103(4) by Defendants Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, J & J Sanitation, Lutz Bobo Law Firm, and FMHA

144.    Plaintiffs reallege and restate paragraphs 1 through 116.

145.    As alleged in Count One, the following individuals violated 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3): Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and Eastman.

**7.4.1**  **Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and/ or FMHA conspired with Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or Eastman**

146.    Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and/or FMHA conspired with Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee, and/or Eastman to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, ¶¶ 118-123) through a pattern of racketeering activity or criminal activity (*see supra*, ¶¶ 92 to 110 and 111 to 116) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and/ or FMHA intended to further an endeavor of Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or Eastman which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

### 7.4.2    Northwestern Mutual conspired with Lee, Eastman and/or Adler

147.    Northwestern Mutual conspired with Lee, Eastman and/or Adler to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, ¶¶ 118-123) through a pattern of racketeering activity or criminal activity (*see supra*, ¶¶ 92 to 110 and 111 to 116) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Northwestern Mutual intended to further an endeavor of Lee, Eastman and/or Adler which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

### 7.4.3    Schalamar GP conspired with Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee and/or Eastman

148.    Schalamar GP conspired with Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee and/or Eastman to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, ¶¶ 118-123) through a pattern of racketeering activity or criminal activity (*see supra*, ¶¶ 92 to 110 and 111 to 116) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Schalamar GP intended to further an endeavor of Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee and/or Eastman which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

### 7.4.4    Schalamar GP and Osprey Links conspired with Lee and/or Eastman

149.    Schalamar GP and Osprey Links conspired with Lee and/or Eastman to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, ¶¶ 118-123) through a pattern of racketeering activity or criminal activity (*see supra*, ¶¶ 92 to 110 and 111 to 116) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Schalamar GP and Osprey Links intended to further an

endeavor of Lee and/or Eastman which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

150. Plaintiffs were injured by Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA's overt acts that are acts of racketeering/crime or otherwise unlawful under the RICO statute, which included (among other acts) acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 92 to 110 , *supra*), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 111 to 116, *supra*).

151. As a direct and proximate result of, and by reason of, the activities of Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, Schalamar Golf Club, J & J Sanitation, Lutz Bobo Law Firm, and FMHA, and their conduct in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.103(3). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or Eastman; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Adler, DeMarco, Provost, Crook, Newkirk, Knapp, Jennings, Lee and/or Eastman; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.5    Count Five – Unjust Enrichment**
by Defendants Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee, and Eastman

152.    Plaintiffs reallege and restate paragraphs 1 through 116.

153.    Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee, and Eastman each individually, received a benefit or and enrichment from Plaintiffs.

154.    The benefit retained by Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee, and Eastman has been at the expense or impoverishment of Plaintiffs.

155.    There is a relationship between the enrichment of Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee, and Eastman and the impoverishment of Plaintiffs.

156.    It would be unjust for Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee, and Eastman to retain the benefit that they received from Plaintiffs.

157.    Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee, and Eastman's unjust enrichment is not justified.

158.    Plaintiffs were directly injured by reason of the unjust enrichment of Adler, DeMarco, Provost, Crook, Newkirk, Jennings, Lee, and Eastman. Plaintiffs do not have an adequate remedy at law.

159.    As a direct and proximate result of, and by reason of, the Defendants unjust enrichment, the Plaintiffs were injured and suffered damages in excess of $1,600,000 to the extent their monies were illegally transferred to the Defendants via payment of the higher lot rent and ad valorem pass-ons through the illegal and fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by the Defendants; to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm

upon them; and to the extent that Plaintiffs have suffered $10,000 to $15,000 reduction in their resale value and expect to suffer a total of over $7,500,000 over the expected 14 years of a typical mobile home park turnover. Plaintiffs are, therefore, entitled to recover the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

7.6     **Count Six – Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
Violation of §§ 501.204, and 501.211, *Fla. Stat.* by all Defendants

160.    Plaintiffs reallege and restate paragraphs 1 through 116.

161.    The Defendants have violated §§ 501.204 and 501.211, *Fla. Stat.*, which prohibit as unlawful unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce.


162.    The Florida Legislature expressly stated that §§ 501.201, *Fla. Stat., et. seq.*, is remedial. Section 501.202, *Fla. Stat.*, reads: "The provisions of this part shall be construed liberally to promote the following policies:

***

(1)     To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.

(2)     To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

(3)     To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."

***

163.    In 1993 the Florida Legislature amended the definition of "Trade or commerce" in § 501.203(8), *Fla. Stat.,* to include services ("... any good or service..."), thereby overruling *Florida v. De Anza Corp.*, 416 So.2d 1173 (Fla. 5th DCA), *pet. den.*, 424 So.2d 763 (Fla. 1982). *De Anza* was also disapproved by the Florida Supreme Court in *Lanca Homeowners, Inc. v. Lantana Cascade of Palm Beach, Ltd.*, 541 So.2d 1121 (Fla. 1988), *cert den.*, 493 U.S. 964 (1989).

164.    The 1993 amendment of § 501.203(8), *Fla. Stat.,* also expansively defined "Trade or commerce" to mean "... the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of *any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated*. 'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity. (Emphasis added)

165.    As mobile home owners and renters of the lot beneath their homes, the Plaintiffs are consumers.

166.    Section 501.203(3), *Fla. Stat.,* defined a "Violation of this part" to mean "... any violation of this act and may be based upon any of the following: ...

*** 

    (b)    The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts;

    (c)    Any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."

***

167.    Murex Properties has continued to send Plaintiffs monthly bills, invoices

and demands for payment of illegal higher lot rent and ad valorem pass-ons through the fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus.

168.    Defendants continue to assert, enforce, and threaten their improper authority to assess and lien to coerce payment of illegal higher lot rent and ad valorem pass-ons through the fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus pursuant to the provisions of the lot rental agreement in violation of §§ 723.021, 501.204, and 501.211, *Fla. Stat.*

169.    Defendants conspire, participate, joined together or act in concert to violate §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*, to benefit themselves, each other, and Adler, DeMarco, Provost, Crook, Newkirk, Murex Properties, Northwestern Mutual, and Knapp.

170.    Defendants, their agents, officers, and directors each participated and were aware of the repeated and continuing violations of §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*

171.    Defendants' acts caused or were likely to cause unjustified injury to the Plaintiffs - namely, injury that is substantial, not outweighed by countervailing benefits to the Plaintiffs or competition that the act or practice produces, and an injury that the Plaintiffs could not reasonably have avoided.

172.    Defendants' acts offend public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to the Plaintiffs.

173.    As a direct and proximate result of, and by reason of, the activities of the Defendants in violation of *Fla. Stat.* §§ 501.204, and 501.211, Plaintiffs were injured and suffered actual damages in excess of $1,600,000 to the extent their monies were illegally transferred to the Defendants via payment of the higher lot rent and ad valorem pass-ons through the illegal and fraudulent forced surrender of the Plaintiffs' resale purchasers'

right to assume the resale sellers' prospectus; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by the Defendants; to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them; and to the extent that Plaintiffs have suffered $10,000 to $15,000 reduction in their resale value and expect to suffer a total of over $7,500,000 over the expected 14 years of a typical mobile home park turnover. Plaintiffs are, therefore, entitled to recover the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

174.    Plaintiffs have been aggrieved by the Defendants' violation of *Fla. Stat.* §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*

175.    Plaintiffs also seek declaratory judgment under § 501.211(1), *Fla. Stat.* Section 501.211(1), *Fla. Stat.*, reads that: "... anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."

176.    As a result, the Plaintiffs are in doubt as to their legal rights under the law. There exists a present, actual need for declaratory relief concerning these bona fide disputes.

**7.7    Count Seven – Denial of Rights of Access under Americans with Disabilities Act ("ADA") –** Violations of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 *et seq.*) and related Florida statutes by Defendants Adler, DeMarco, Provost, Crook, Newkirk, Murex Properties, Northwestern Mutual, Knapp, Osprey Links, and Schalamar GP

177.    Plaintiffs reallege and restate paragraphs 1 through 58.

178.    The Plaintiffs are "elderly persons" as defined by Section 825.101( 4), *Fla. Stat.*, as persons " ... 60 years of age or older who is suffering from the infirmities of aging as manifested by advanced age or organic brain damage, or other physical, mental, or emotional dysfunctioning, to the extent that the ability of the person to provide adequately for the person's own care or protection is impaired." The Plaintiffs have mobility, balance, gait, vision, and hearing difficulties. When traveling about in public, many Plaintiffs require the use of either walking canes or sticks, walkers, wheelchairs, audiovisual devices, and hearing aids. Consequently, many Plaintiffs are "physically disabled," as defined by all applicable Florida and United States laws, and a member of the public whose rights are protected by these laws.

179.    Plaintiffs suffer from low vision and age-related cognitive decline as a "qualified disability" under the ADA as defined in 42 U.S.C. §12012 (1)(A) and in 42 U.S.C. 3602, §802(h). They are substantially limited in performing one or more major life activities, including but not limited to accurately visualizing their world, adequately traversing obstacles and walking without assistance.

180.    The Park is a public accommodation, open to the public, which is intended for nonresidential use and whose operation affects commerce.

181.    The Plaintiffs live in the Schalamar Creek Mobile Home Park visit the Park facilities on a regular basis. Plaintiffs regularly encounter barriers (both physical and intangible) that interfered with - if not outright denied - their ability to use and enjoy the goods, services, privileges and accommodations offered at the Park. Plaintiffs personally

encountered the following barriers at the Facility:

a)     The only ramp located at the right side of the Clubhouse parking area is improperly configured and contains no guide curbs;

b)     On numerous occasions during their visits to the Clubhouse, Plaintiffs experienced problems when transferring onto their wheelchair from their vehicle because of the configuration and side-slope of the designated parking space and access aisle located next to it;

c)     During many visits to the rental office located inside the Clubhouse, Plaintiffs have attempted but been unable to enter the office because the door of the office is too narrow for a wheelchair;

d)     Plaintiffs have been unable to enter the rental office by using an alternative entrance. Plaintiffs have been unable to place their rental payment into the box located outside of the office and have had to return to place their payment in the box;

e)     The public restrooms located inside the Clubhouse lack necessary wheelchair clearances to use the sink. Plaintiffs experienced difficulty on many occasions while trying to use the restroom in the four years preceding this action;

f)     Only one heated pool has a lift; the other pool and whirlpool does not have a lift.

182.     Plaintiffs were, and continue to be deterred from visiting the Clubhouse because they know that the Clubhouse's goods, services, facilities, privileges, advantages, and accommodations deny full and equal access to Plaintiffs due to their physical disabilities. Plaintiffs have learned that the following additional barriers to their full and equal access exist at the Facility, each of which relates to his disabilities:

### 7.7.1   Site Entrance Signage

a)      Site informational signage was not provided directing to the accessible entrance and route of travel.

b)      Tow-away warning signage was not provided visible from the street entrance or accessible parking space.

### 7.7.2   Accessible Parking

c)      Van accessible signage was not provided for the van accessible parking space.

d)      Accessible parking access aisles was not outlined in blue.

e)      Accessible parking signage mounted on the pole is not 80" minimum above the surface.

### 7.7.3   Exterior Accessible Routes

f)      A minimum of one accessible route was not provided from the public way to the accessible entrance. The main social room is only accessible via a steep (graded in excess of 25%) paved driveway to the front entrance.

g)      Sidewalk has raised lips that exceed 1/4" in height.

h)      Ramp at the end of the access aisle does not have edge protection on both sides of the ramp and exceeds 8.33%.

### 7.7.4   Accessible Doors

i)      Entrance door thresholds exceed 1/2″ in height.

j)      Entrance door landings exceed 2% slope.

k)      Entrance doors do not have the required smooth kick plate 10" high on the bottom of the doors.

### 7.7.5   Lack of Elevator

l)    There is no elevator in the three floor clubhouse. The main social events or large congregational ball room is on the second floor. Defendants' management offices are on both the second and third floors.

### 7.7.6   Restrooms

m)    Side grab bars are not 48" long and extending a minimum of 24" in front of the toilet.

n)    Rear grab bar was not properly located on the wide side of the toilet.

o)    Soap dispenser was not located to be 40" maximum above floor to operable parts.

p)    Toilet paper dispenser was not located to be 7"- 9" in front of toilet.

q)    Plumbing and sharp objects under sink were not properly protected.

r)    Toilet was not offset to be 16"-18" from side wall.

s)    Proper floor clear area was not provided in front of the toilet for transfer space.

### 7.7.7   Seating & Tables in restaurant

t)    A minimum of one accessible table was not provided with proper knee clearance.

### 7.7.8   General

u)    Defendants do not have policies, practice and procedures in place to ensure that the Park is maintained in a condition so as to provide

full and equal access to persons in wheelchairs.

v)      There are no fire alarms, strobes, horns or sprinkler system in the
main social events or large congregational ball room on the second
floor.

183.    Plaintiffs live at the Schalamar Creek Mobile Home Park and must have
ongoing access to the Clubhouse.

184.    Defendants knew or should have known that these elements and areas of
the Clubhouse were inaccessible, violate state and federal law, and interfere with or deny
access to the physically disabled. Moreover, Defendants have the financial resources
to remove these barriers from the Park without much difficulty or expense, and make
the Park accessible to the physically disabled. To date, however, Defendants refuse to
either remove those barriers or seek an unreasonable hardship exemption to excuse non-
compliance.

185.    At all relevant times, Defendants have possessed and enjoyed sufficient
control and authority to modify the Park to remove impediments to wheelchair access and
to comply with the 2010 Standards for Accessible Design. Defendants have not removed
such impediments and have not modified the Park to conform to accessibility standards.
Defendants have intentionally maintained the Park in its current condition and have
intentionally refrained from altering the Park so that it complies with the accessibility
standards.

186.    Title III of the ADA holds as a "general rule" that no individual shall be
discriminated against on the basis of disability in the full and equal enjoyment (or use)
of goods, services, facilities, privileges, and accommodations offered by any person who
owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a).

187.    Defendants discriminated against Plaintiffs by denying them "full
and equal enjoyment" and use of the goods, services, facilities, privileges and

Page 91

accommodations of the Clubhouse during each visit and each incident of deterrence.

Failure to Remove Architectural Barriers in an Existing Facility

188.     The ADA specifically prohibits failing to remove architectural barriers, which are structural in nature, in existing facilities where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv).

189.     When an entity can demonstrate that removal of a barrier is not readily achievable, a failure to make goods, services, facilities, or accommodations available through alternative methods is also specifically prohibited if these methods are readily achievable. *Id.* § 12182(b)(2)(A)(v).

190.     Here, Plaintiffs allege that Defendants can easily remove the architectural barriers at the Park without much difficulty or expense, and that Defendants violated the ADA by failing to remove those barriers, when it was readily achievable to do so.

191.     In the alternative, if it was not "readily achievable" for Defendants to remove the Park's barriers, then Defendants violated the ADA by failing to make the required services available through alternative methods, which are readily achievable.

### 7.7.9   Failure to Make an Altered Facility Accessible

192.     On information and belief, Defendants have made substantial alterations to the Clubhouse since 2011 and have failed to make the altered Clubhouse accessible.

### 7.7.10   Failure to Modify Existing Policies and Procedures

193.     Defendants have failed to modify their existing policies and procedures to address accessibility and ADA compliance.

194.     Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. Plaintiffs are entitled to have reasonable attorneys' fees, costs and expenses paid by Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants and request injunctive and declaratory relief.

**8.0    Demand For Jury Trial**

Plaintiffs demand a jury trial as to all issues triable by jury in this case.

**9.0    Relief Requested (All Counts)**

Wherefore, as to all counts, Plaintiffs request that:

a.      Judgment be entered in favor of Plaintiffs and against Adler, DeMarco, Provost, Newkirk, Crook, Knapp, Jennings, Lee, Murex Properties, Northwestern Mutual, Osprey Links, Schalamar GP, J & J Sanitation, Lutz Bobo Law Firm, and FMHA jointly and severally, in the amount of Plaintiffs' damages to be proven at trial;

b.      Plaintiffs be awarded treble damages to the extent permitted by 18 U.S.C. § 1964(c) and § 772.104, *Fla. Stat.*;

c.      Plaintiffs be awarded punitive damages to the extent permitted by § 768.72, *Fla. Stat.*;

d.      Plaintiffs be awarded actual damages under *Fla. Stat.* §501.211;

e.      Plaintiffs be awarded prejudgment interest on the amount of damages and/ or losses that Plaintiffs have sustained;

f.      Plaintiffs be permitted, pursuant to Rule 67(a), *Fed. R. Civ. P.*, to deposit with the Court all or part of the ongoing lot rental payments obtained through the fraudulent forced surrender of the Plaintiffs' resale purchasers' right to assume the resale sellers' prospectus;

g.      Plaintiffs be awarded a judgment declaring that the Defendants' conduct is prohibited by Chapters 501 and 723, *Fla. Stat.*;

h.      Plaintiffs be awarded a judgment declaring that the Defendants violated §§ 501.204, 501.211, and Chapter 723, *Fla. Stat.*

   i.  Plaintiffs be awarded a judgment declaring under § 501.211(1), *Fla. Stat.*, that Defendants' acts or practices violate Chapter 501 Part II, *Fla. Stat.*;

   j.  Plaintiffs be awarded injunctive relief pursuant to Rule 65, *Fed. R. Civ. P.*;

   k.  Plaintiffs be awarded injunctive relief prohibiting defendants who have violated, are violating, or likely to violate Chapter 501 Part II, *Fla. Stat.*;

   l.  The Court issue a declaratory judgment that Defendants violated the Plaintiffs' rights as guaranteed by the ADA;

   m.  The Court enter an Order directing Defendants to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time so as to allow the Defendant to undertake and complete corrective procedures to the physical infrastructure of the Park;

   n.  The Court enter an Order directing Defendants to establish a policy of accessibility features for the physical infrastructure of the Park;

   o.  Plaintiffs be awarded reasonable costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and §§ 501.2105, 501.211, 723.068, *Fla. Stat.*;

   p.  Plaintiffs be awarded a judgment eliminating or vacating any recorded lien recorded by, or for the benefit of, the Defendants;

   q.  Plaintiffs be awarded a judgment piercing of any limited liability veil;

r.      Plaintiffs be awarded such other and further equitable and legal relief as the Court deems just and necessary.

Dated: February 3, 2019.

Respectfully Submitted,

/S/ Daniel W. Perry
DANIEL W. PERRY
"Trial Counsel"
Fla. Bar No. 376671
4767 New Broad St, #1007
Orlando, FL 32814-6405
Ph: 407-894-9003
Email: dan@danielperry.com
Counsel for Plaintiffs