# ASSUMPTION OF LEASE
To be completed by Schalamar Staff only

THIS ASSUMPTION OF LEASE (the "Agreement") is made this     January 1, 2018
between Schalamar Creek Golf and Country Club Community, LTD ("Lessor"), and

_____ ("Seller(s)") and

Howard Greenburg _____ ("Buyer(s)").

## RECITALS

WHEREAS, Lessor is the owner of the Schalamar Creek Golf and Country Club Community ("the Community").

WHEREAS, Seller is a tenant residing in the Community at    **499**    (the "Lot") pursuant to a Rental Agreement ("the Lease") attached as an exhibit to the Prospectus applicable to Seller.

WHEREAS, Buyer wishes to purchase Seller's home in the Community and to assume all of the rights, and obligations under Seller's Lease for the balance of the current lease term which term expires on **12/31/2018**     Assumed Seller monthly base lot rental amount by Buyer shall commence on the date of Seller/Buyer Home Closing and shall terminate on December 31st of that year. For subsequent years - see the new Buyer lease and prospectus.

NOW THEREFORE, the parties agree as follows:

### Part I

1. <u>Recital.</u> The above recitals are true and correct and are incorporated herein by reference.

2. <u>Assumption.</u> Buyer hereby assumes all of the rights and obligations of Seller under and pursuant to Seller's Lease and acknowledges that Buyer shall be bound by all provisions of Seller's Prospectus incorporated as part of that Lease, for the remainder of the lease term in effect at the time of home sale closing. Included within the assumed rights and duties is the Seller's current monthly base lot rental amount which will remain in effect for the unexpired portion of the Seller's current lease term ending December 31st. Seller's current base monthly lot rental amount is    **$688.28** .

3. <u>New Lease.</u> Concurrent with execution of this Agreement, Buyer shall sign a new Lease with Lessor to take effect upon expiration of the current term of the Assumed (Seller's) Lease. Buyer acknowledges receipt of a complete copy of the Park's current Prospectus,    PRMZ000425-P6 by execution of this Agreement. Said Prospectus shall govern Buyer's tenancy in the Community as of **1/1/2019** , upon the expiration of the assumed (Seller's) Lease.

4. <u>Lot Rental Amount</u> All specific information regarding the lot rental amount applicable to Buyer's tenancy shall be provided by Schalamar Creek and shall be disclosed in Part II of this Agreement. Buyer should not rely on any oral representations regarding the lot rental amount.

### Part II

1. <u>Market Rent.</u> Effective    **1/1/2019**    when the assumed (Seller's) lease expires, Lessor will will increase the monthly base lot rental amount to the then current "market rent" being charged for

similar lots. Thereafter, future annual increases shall be governed by the terms of Prospectus <u>PRMZ000425-P6</u>   As of the date of this Assumption, market rent for the Lot is <u>$690.00</u>

Upon commencement of the lease term governed by the New Lease above, the market rent for the Lot will be <u>$690.00</u> plus any rental amount increases separately noticed for similar lots within the park, between today's date and the end of the assumed lease period.

The consumer price index reporting period utilized for the purpose of calculating rent increases for subsequent years after the beginning lease term year shall be the consumer price index for the month of July for the year immediately preceding the calendar year for which any rental increase would be effective. Lease renewals will become effective the first day of January each year thereafter. (See section VIII of your Prospectus for additional details.)

This Assumption of Lease overrides Section VIII, Paragraph 2 of your Prospectus for the balance of the lease period from Buyer/Seller Closing Date until **12/31/2018**. Should this property be resold during the above mentioned period, this Assumption of Lease shall become null and void. Should the the home sale contemplated in this agreement not sell and close by December 31st of the same calendar year this agreement was executed by the Seller, this Assumption of Lease shall become null and void. A new Assumption of Lease is required for homes on the market at the change of the calendar year.

Your signature below acknowledges that you: 1) have elected to assume the remaining term of the above-referenced Rental Agreement; 2) agree to be bound by the terms and conditions of that Rental Agreement; 3) are aware that your lot rental amount will be raised to the level of current market rent as referenced above and will be governed by the disclosures made in the Prospectus <u>PRMZ000425-P6</u>   regarding increases in lot rental amount; and 4) have received a copy of the Prospectus with Rules and Regulations.

2 <u>Consent.</u> Lessor hereby consents to the terms of this Assumption agreement by its execution hereof. Lessor has reviewed Buyer's application for residency in the park, and agrees to permit Buyer to become a resident of the Property.

3 <u>Ratification.</u> All terms and conditions of the New Lease and the current Park Prospectus, <u>PRMZ000425-P6</u>   are hereby ratified and confirmed and shall remain binding on Buyer and Lessor throughout the remainder of the tenancy created.

4 <u>Binding Effect.</u> This Agreement shall be binding upon and inure to the benefit of each party's respective successors, assigns, heirs and legal representatives.

5 <u>Entire Agreement.</u> This Agreement represents the entire understanding among the parties with respect to the subject matter contained herein. All other understandings or oral discussions are expressly contained herein.

IN WITNESS WHEREOF, this Agreement has been duly executed this   2/2/2018  .

WITNESSES:

_____   _____
(Witness to Buyer)                                      (Buyer)  Howard Greenburg

_____   _____
(Witness to Buyer)                                      (Buyer)

_____         _____
(Witness to Seller)                (Seller)

_____         _____
(Witness to Seller)                (Seller)

                                  Schalamar Creek Golf and
                                  Country Club Community

                                  By: _____
_____         Resident Manager      Date
(Witness to Resident Manager)

## Prospectus Receipt

I/we, <u>          Howard Greenburg &               </u>, hereby acknowledge receipt of a copy of the Prospectus for Schalamar Creek Golf & Country Club Community, and a copy of the Community Rules and Regulations on <u>    2/2/2018    </u>. In addition, it is my understanding that the Prospectus received by me, has, by mutual agreement of the Schalamar Creek Mobile Home Owners Association, Inc., (hereinafter referred to as ASSOCIATION) and Schalamar Creek Golf and Country Club Community, Ltd,. SCHALAMAR) been interpreted as is set forth below:

SCHALAMAR and ASSOCIATION agree on behalf of all HOMEOWNERS that SCHALAMAR may pass on at any time during the lot rental agreement, ad valorem property taxes and utility charges, or increases of either, to the HOMEOWNERS under the P1, P2, P3, P5 or P6 Prosepectuses, as of the effective date of this Agreement. As to the lease of any lot where a new home (not previously purchased) is located, the ad valorem tax will be prorated from the date of closing until December 31 of that calendar year. The homeowner will receive an invoice for this prorated amount at the end of the current year after the Community has received the ad valorem bill from Polk County, Florida. From the current year forward, beginning January 1 of the year subsequent to the purchase of the new home and lease of the lot where the home is located, the homeowner will be responsible for the ad valorem tax passed on for that entire year (12 months). I/We understand that our portion of the ad valorem property tax is due and payable on or before the 6th day of January of the year following the taxation, late on the 7th day of January and will incur a $5.00 per day late charge from the 7th day of January until paid in full.

As to any and all Buyers of "Resale" homes in the Community governed by the P1, P2, P3 Prospectus, or as to any Home Owner who received a P1, P2, or P3 Prospectus, the consumer price index reporting period utilized for the purpose of calculating rent increases for subsequent years after the beginning lease term year shall be the consumer price index for the month of July for the year immediately preceding the calendar year for which any rental increase would be effective. Lease renewals will become effective the first day of January each year thereafter. (See Section VIII of your prospectus for additional details.) Additionally, the provisions of Section VIII, Paragraph 6, "Other Fees Charged to the Home Owner" shall be deemed to include the following fees as if set forth fully therein:

**Taxes and Governmentally Related Fees\*\***  **All taxes, fees, and charges of any nature whatsoever required to be paid now or in the future by any governmental entity. Such taxes, fees and charges shall be in addition to the base rent and charged to residents as a "pro rata share". Included within this category of special use fee by way of example, and not by way of limitation, are: (1) future charges for functions currently performed by governmental units without separate billing, but which are later billed separately to the Park; (2) charges for those services now performed by governmental units and charged as part of the Park's property assessment, but which are later converted to private operation and separately billed to the park. Such increases in special use fees will be make pursurant to Florida Law.**

\*\*Taxes/Governmental pro rata fees for year  2017 are    $ <u>810.75</u>  for Ad Valorem and    $ <u>98.35</u>  for Fire Assessment Fee.  Subsequent years taxes/fee amounts will be determined by the Polk County Appraisers Office.

Additionally, any and all tree trimming or tree removal related to my applicable rented lot shall be my responsibility. Such trimming or removal shall require management approval as further spelled out in the Prospectus.

Continued on next page…..

Prospectus Receipt

Regarding renting out the house located on this lot: I/We understand that although it is presently allowed to rent the house privately, certain restrictions do apply - Namely: Prior to accepting a renter, an Application for Residency must be completed and signed by the prospective renters; an Addendum to Residency form and a Disclosure form must also be signed by the prospective renters (these forms can be obtained from the Resident Manager's office); and a $50.00 per person fee must be submitted for a criminal background check on each potential renter who must qualify with no criminal history. **These forms must be submitted to the Resident Manager's office for approval prior to allowing a renter to take possession of the house.** Once qualified, the renters can be approved for temporary residency. I/We understand that although renting the house privately is currently allowed, SCHALAMAR has the sole discretion to change this privilege at any time and/or levy a monetary penalty if violated.

I/We understand and agree that all of my/our personal property is my/our responsibility to maintain and properly insure.

I/We agree to pay the rent on the lot listed below on or before the 6th day of each month with the understanding that beginning on the 7th day of each month, if the lot rent is not paid, I/we will incur a late charge of $5.00 per day until paid in full.

I/We agree to these terms and agree that the Prospectus provided to me/us on this date shall be construed to include these terms as if set forth fully therein. I/we also agree to advise future Buyers of our Schalamar Creek home of the terms set forth in the Prospectus and this Prospectus receipt. I/We understand that the Prospectus has been amended and such amendment approved by the State of Florida, Department of Business and Professional Regulation, and includes those terms.

_____     _____
Howard Greenburg

_____     _____
Schalamar Creek Community Manager          Date



# New Community Member Bonus Program
2 Years Lot Rental Coupon

*P6 Program - LOT RENT COUPON*

[✓] $1,000 Golf Membership Credit

This certificate entitles the lessee(s): Lisa Kisch / Scott Morrissey

to the discounts on their Monthly Base Lot Rent Amount on Lot #: __708__ as outlined below:

**Through December 2017**  Assume seller's monthly base rental amount  523.78  per month. See "Assumption of Lease"

**January through December 2018**  Deduct $ __122.91__ per month from 2018 Monthly Base Lot Rental amount
$1,474.86 Annual Savings!

The Monthly Base Lot Rental amount for 2018 is determined by the Current Market Rental amount,
$710.00  plus annual increase as defined in your lease and prospectus

**January through December 2019**  Deduct $ __61.45__ per month from 2019 Monthly Base Lot Rental amount
$737.43 Annual Savings!

The Monthly Base Lot Rental amount for 2019 is determined by the 2018 Monthly Base Lot Rental
amount plus annual increase as defined in your lease and prospectus.

This coupon is valid for the lot shown above and cannot be sold or transferred. Coupon has no cash value. Coupon authenticity must be verified by Community Manager.

_[signature]_  5-11-17        _[signature]_  5-11-17
Lessee          Date            Community Manager    Date

_[signature]_  5-26-17        _____
Lessee          Date            Community Accounting   Date

*One copy each to lessee, lessee's file and Community accounting to initialize the program.*

**EXHIBIT B**

# LUTZ, BOBO & TELFAIR, P.A.

| | | |
|---|---|---|
| J. ALLEN BOBO<br>J. MATTHEW BOBO<br>ROGER P. CONLEY*<br>JOHN R. DUNHAM, III<br>DAVID D. EASTMAN<br>JODY B. GABEL<br>SCOTT E. GORDON<br>CAROL S. GRONDZIK<br>WILLIAM S. KORP*<br>RICHARD P. LEE<br>ZACHARY J. LEE<br>CHARLES LOVINGS, III<br>ELIZABETH C. LUTZ<br>H. ROGER LUTZ<br>CHARLES W. TELFAIR, IV<br>JONATHAN P. WHITNEY<br><br>*OF COUNSEL | LAW FIRM<br><br>2155 DELTA BOULEVARD, SUITE 210-B<br>TALLAHASSEE, FL 32303<br><br>850-521-0890 \| FAX 850-521-0891<br>877-521-0890<br>E-MAIL: INFO@FLORIDAHOUSINGLAW.COM<br><br>RESPOND TO TALLAHASSEE | 2 N. TAMIAMI TRAIL, 5TH FLOOR<br>SARASOTA, FL 34236-5575<br>941-951-1800<br>877-951-1800<br>FAX 941-366-1603<br><br>2401 MANATEE AVENUE W.<br>BRADENTON, FLORIDA 34205<br>941-748-8778<br>866-802-8182<br>FAX 941-366-1603<br><br>122 NESBIT STREET<br>PUNTA GORDA, FL 33950<br>941-655-6910<br>866-802-8182<br>FAX 941-366-1603 |

June 23, 2017

Mr. Russ Weiderman  
1689 Deverly Drive  
Lakeland, Florida 33801

CERTIFIED MAIL  
RETURN RECEIPT REQUESTED

Re:   Prospectus Delivery and Assumption of Resident Tenancy

Dear Mr. Weiderman:

This firm represents Schalamar Creek and in that regard has been asked to respond to your article published in the May 2017 issue of the Schalamar Creek Summer Newsletter. In your article you state that:

> Another topic of discussion is [sic] changes to FS 723 that the FMHA . . . is looking for in the future. The most interesting was their desire to allow the park owners to assign the current prospectus to all new home owners at the time they purchase a home in the park. In our community, the current prospectus is a P6. *By law, the new prospectus should only be given to first time buyers of a <u>new</u> home. A new prospectus should not be given to a buyer purchasing a used home unless agreed to by the buyer and park management.*
>
> This is a change to the *current law which gives all buyers of used homes in parks like ours the right to assume the original prospectus that was assigned to the initial buyer of the house.* This means that if the original buyer bought the house with a P5 or older prospectus, you have the right as the new homeowner to assume the P5 or older prospectus as originally assigned by Schalamar Creek.

(Emphasis added.)

"AV" RATED BY MARTINDALE-HUBBELL

**EXHIBIT C**

Mr. Russ Weiderman
June 23, 2017
Page 2

Based on section 723.059(5) the italicized statements in your article are false. Whether the purchaser is a first time buyer of a new home is completely irrelevant, and there is absolutely no legal basis for a claim that all buyers of used homes have "the right to assume the original prospectus that was assigned to the initial buyer of the house." You have misinterpreted the disclosure in section 723.059(3) regarding delivery of the prospectus of the "initial recipient." The initial recipient is the initial home owner whose tenancy was governed by the prospectus which governs the present home owner's tenancy; it is most certainly not the prospectus given to the original owner of the home. If a home owner accepts a new prospectus he is the initial recipient of that prospectus. Your interpretation would result in an unconstitutional perpetual tenancy.

Based on section 723.059(5) the right of assumption depends on whether the seller's tenancy was governed by a lifetime lease, an automatically renewing lease or a simple annual (or multiple year) lease. The purchaser of a home the seller of which possessed a non-lifetime automatically renewing lease may lawfully assume the balance of the existing term of his seller's lease but the park owner has the legal right to preclude assumption of the automatically renewing provision of that rental agreement and its incorporated prospectus.[1]

The implication of your article is that Schalamar Creek is acting illegally. Be advised that while homeowners have a right to express their displeasure about the park or anything associated therewith to anyone, verbal or written attacks or accusations concerning the park owner or park management which cannot be verified or which are made without knowledge of all of the facts relevant to the matters could be characterized as being made in reckless disregard of the truth. Any such statement as well as any knowingly false statement is potentially slanderous or libelous and may subject the offending resident to a lawsuit for damages suffered by the park the park owner. Such damages could include those arising from a lost sale and loss of subsequent rental payments arising from actions intended to disparage the park owner and/or management.

Sincerely,

Richard P. Lee

---

[1] Pursuant to section 723.031(10) the prospectus is incorporated into the lot rental agreement.



## GENERAL COUNSEL'S COMMENTS

**The Sale of a Mobile Home Creates Opportunity for Community Management.**

Whenever a home owner sells his or her mobile home, community management should actively work on creating and establishing a good, well-informed relationship with the new owner. Not only can a new personal relationship be built, but it is also an opportunity to button up the document file and establish a new contractual relationship with the purchaser.

Community management should interview and inform the potential purchaser about the requirements for qualifying as a home owner in the community. It is important to



develop a personal relationship with the buyer, such as where are they from, what are their interests, what can you, as management, do to help them adjust to their new home. In addition, management should make sure that the purchaser understands their legal obligations, the rules and regulations should be explained and the basis for those rules being enforced, the rental agreement and prospectus for the new home owner and anything else that may need to be emphasized. Each community is different and it is difficult to have general rules that apply.

However, one thing is quite clear: management needs to have the new home owner agree to the terms and conditions of the tenancy. That means filling out the blanks in the community prospectus, going over the rules and regulations so that the buyer understands them (and initials that they have read the rules and regulations), and that the rental agreement is filled out and signed by the home owner(s).

The question of the delivery of a new prospectus and rental agreement are issues for Community Management to be aware of and be extremely careful to make the right decision. Some existing prospectuses and rental agreements are assumable. What does it mean to assume a rental agreement? Section 723.059, Florida Statutes, provides:

**Rights of purchaser—**

(3) The purchaser of a mobile home who becomes a resident of the mobile home park in accordance with this section has the right to assume the remainder of the term of any rental agreement then in effect between the mobile home park owner and the seller and shall be entitled to rely on the terms and conditions of the prospectus or offering circular as delivered to the initial recipient.

(4) However, **nothing herein shall be construed to prohibit a mobile home park owner from increasing the rental amount to be paid by the purchaser upon the expiration of the assumed rental agreement in an amount deemed appropriate by the mobile home park owner**, so long as such increase is disclosed to the purchaser prior to his or her occupancy and is imposed in a manner consistent with the initial offering circular or prospectus and this act.

(5) **Lifetime leases and the renewal provisions in automatically renewable leases, both those existing and those entered into after July 1, 1986, are not assumable** unless otherwise provided in the mobile home lot rental agreement or unless the transferee is the home owner's spouse. The right to an assumption of the lease by a spouse may be exercised only one time during the term of that lease.

(Emphasis added). The type of prospectus you have and whether it and the rental agreement are assumable are legal questions. The general rule is that management should secure a signed rental

CONTINUED ON PAGE 9

**EXHIBIT D**



## HUD'S PROPOSED AMENDED RULE MAY DETER LAND USE DISCRIMINATION

The biggest obstacle to the growth of manufactured housing is discriminatory land use regulations. Florida is a prime example of where manufactured housing has been zoned out of most single-family residential districts. Local government has been able to get away with this discriminatory practice because they don't exclude manufactured housing from all land use areas, but instead relegate it to specific zoning districts. These districts are usually less-desirable, such as low-density agricultural or in mobile home parks where a special use permit is required.

In October, FMHA submitted comments to HUD regarding the proposed amended rule for Affirmatively Furthering Fair Housing (AFFH). FMHA's comments dovetailed with previous comments submitted by the Manufactured Housing Institute (MHI). One of the stated purposes of the AFFH rulemaking is to: "(4) seek to encourage actions to increase housing choices, including through greater housing supply." Clearly, land use regulations that exclude manufactured housing from certain zoning districts that has a direct and disparate impact on protected classes of persons is contrary to this stated goal.

In its comments, MHI strongly encouraged HUD to broadly exercise its existing powers granted in the Manufactured Housing Improvement Act of 2000 to prevent land use regulations (or code enforcement activities) that exclude manufactured housing in communities, particularly where such action has a direct and disparate discriminatory impact on protected classes of persons. MHI went on to state that the goals of AFFH cannot be achieved without HUD revising its Statement of Policy 1997-1 State and Local Zoning Determination Involving HUD Code. MHI believes Congress codified "affordability" as a standard for HUD's authority to act.

As such, revising the 1997 Directive would be in line with the new stated purposes of the proposed rule whereby AFFH should seek to encourage actions that increase housing choice, including through greater housing supply." MHI has consistently argued that HUD should use its preemptive authority in a manner consistent with Congressional intent. The amended AFFH is yet another area of HUD jurisdiction where its use is not only appropriate but mandated by Congress.

The proposed amended rule for AFFH and revising the 1997 State of Policy on State and Local Zoning provide HUD an opportunity to deliver meaningful actions on their positive statements about the need to expand the use of manufactured housing. At the same time, FMHA and its members have a responsibility to be diligent in educating the public and local land use officials about the potential role of manufactured housing in solving the growing demand for affordable workforce housing.

## GENERAL COUNSEL'S COMMENTS                           CONTINUED FROM PAGE 6

agreement for the next rental period, regardless of whether or not the seller's rental agreement was assumed and a new prospectus delivered. The rental agreement should contain the lot rental amount currently charged, and all other terms and conditions of the tenancy. The home buyer(s)' prospectus and rental agreement should be filled out with the buyer(s)' name and lot number that is leased. That helps to create a new tenancy based upon current documents and lot rental amount. This is very important if there is any litigation over the tenancy, the lot rental amount and other issues addressed in the documents.

Community management recommended practice for record keeping is the following:

1. Have the current prospectus associated with each lot;

2. Have the current rental agreement with each lot;

3. Determine whether or not that rental agreement is assumable by the buyer;

4. Be prepared with a new rental agreement and prospectus for each buyer;

5. If the "Buyer" asserts he or she wants to assume the seller's rental agreement, then determine if this is allowed.

This transition time might be community management's best opportunity to properly set the table for long term success with each new resident. If you have questions about assumable rental agreements, prospectuses, or any portion of the transition of residents selling home, reach out to the FMHA or contact your local attorney.