[DO NOT PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

————————————————

No. 20-13415
Non-Argument Calendar

————————————————

D.C. Docket No. 8:19-cv-00291-TPB-AEP

SCHALAMAR CREEK MOBILE HOMEOWNER'S
ASSOCIATION, INC.,
on behalf of the homeowner members in its
representative capacity and on behalf of themselves
and others similarly situated,
SHERRY ATWOOD,
JAMES DRISKELL,
DON GLEDHILL,
LINDA GLEDHILL,
BARB GRIFFIN,
JOETTE KELLY,
CATHY LISKA,

Plaintiffs-Appellants,

PHIL FEATHERBAY,

Plaintiff,

versus

STEVEN ADLER,

LORRAINE DEMARCO,
R. SCOTT PROVOST,
CHARLES CROOK,
MARTI NEWKIRK, et al.,

                                        Defendants-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(May 7, 2021)

Before WILSON, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

Schalamar Creek Mobile Homeowner's Association, Inc. and seven residents of Schalamar Creek Golf Mobile Home Park appeal the district court's summary judgment for the defendants, the owners and operators of the mobile home park, on their claims that the defendants violated the Racketeer Influenced and Corrupt Organizations Act and the Americans with Disabilities Act.  The district court granted summary judgment for Schalamar Creek's owners and operators because the residents and the homeowner's association did not have standing to pursue their claims.  We agree with the district court that the residents did not have standing to bring the RICO claims and affirm summary judgment for the owners and operators.  Although we disagree with the district court that the homeowner's association did not have standing to bring an Americans with Disabilities Act claim, we still affirm

because there is no summary judgment evidence that the proposed modifications to Schalamar Creek's clubhouse were "readily achievable."

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Schalamar Creek is a mobile home community located in Polk County, Florida, designed for adults fifty-five or older.  Like many mobile home parks, Schalamar Creek offers amenities for its residents.  It has a golf course, a driving range, several pools, a lounge, and a clubhouse.  The clubhouse, built in 1989, is a three-story building with its own amenities.  There is a restaurant on the first floor. On the second floor, there is a large event space and a bank.  The rent deposit box is also located on the second floor.  The third floor houses offices for Schalamar Creek's management.  The golf course, driving range, restaurant, bank, and lounge are open to the public.

Schalamar Creek is owned by Osprey Links, LLC, a subsidiary of Northwestern Mutual Life Insurance Company.  The park is operated and managed by Murex Properties, LLC.  Schalamar Creek's residents are represented by the homeowner's association, which is authorized by statute to act as their representative in matters relating to Schalamar Creek's operations.  See Fla. Stat. § 723.075(1) ("[T]he association shall become the representative of all the mobile home owners in all matters relating to this chapter, regardless of whether the homeowner is a member of the association.").

In Florida, the Mobile Home Act governs the relationship between the residents and the owners and operators of mobile home parks.  See Fla. Stat. § 723, et. seq.  Schalamar Creek's residents own their mobile homes, but pursuant to the Act they lease the land beneath their homes from Schalamar Creek's owners.  As required by the Act, these leases incorporate a prospectus—a disclosure document that contains information about the rents and fees applicable to the property.  See id. § 723.012 (discussing the required contents of a prospectus).  The prospectus also "delineates the basis for, and the procedure governing, future rent increases."  See Herrick v. Fla. Dep't of Bus. Regul., Div. of Fla. Land Sales, Condos. & Mobile Homes, 595 So. 2d 148, 152 (Fla. Dist. Ct. App. 1992) (explaining the purposes and contents of a mobile home park prospectus).  When someone buys a mobile home from an existing resident, the Act gives him or her the right to assume the seller's existing lease and the applicable prospectus.  Fla. Stat. § 723.059 ("The purchaser of a mobile home who intends to become a resident of the mobile home park in accordance with this section has the right to assume the remainder of the term of any rental agreement then in effect between the mobile home park owner and the seller and may assume the seller's prospectus.").  It is this right that gives rise to this appeal.

In 2019, the homeowner's association and seven residents of Schalamar Creek sued the owners and operators for violating RICO and the Americans with

Disabilities Act. The residents alleged that the defendants acted as an "enterprise" for the "shared common purpose of defrauding" the residents through the "forced surrender" of the residents' rights to assume their sellers' prospectuses. They alleged that the defendants fraudulently induced prospective sellers whose properties were governed by an older, more favorable prospectus to adopt the P6 prospectus[1] using bribes, misrepresentations, and other incentives via the mail or wires, in violation of 18 U.S.C. sections 1341 and 1343. The residents alleged that: (1) they were injured by the defendants' actions because they were forced to pay a higher rental price than they would have paid under the pre-existing prospectus, and (2) they were deprived of their statutory right to assume their sellers' existing prospectus.

The homeowner's association also alleged that Murex Properties (Schalamar Creek's operator), Steven Adler (the president and chief executive officer of Murex Properties), and Northwestern Mutual (Schalamar Creek's indirect owner), violated the Americans with Disabilities Act because some of the common areas of Schalamar Creek were not accessible to disabled residents. In particular, they pointed to obstacles at the clubhouse that made it inaccessible to residents who were "elderly persons" with "mobility, balance, gait, vision, and hearing difficulties."

---

[1] The P6 prospectus was one of mobile home prospectuses authorized by the state of Florida for use at Schalamar Creek at the time.

The defendants moved for summary judgment.  As to the RICO claims, they argued that the residents did not have standing because they purchased properties already subject to the P6 prospectus, so the alleged scheme did not cause their injury. As to the Americans with Disabilities Act claim, they argued that the homeowner's association did not have associational standing because the residents would not have standing and the claim was not "germane" to the purpose of the homeowner's association.  The defendants also argued, as to the Americans with Disabilities Act claim, that there was no summary judgment evidence that the proposed modifications to the clubhouse were "readily achievable."

The district court granted summary judgment for the owners and operators. As to the RICO claims, the district court found that the residents did not have standing to pursue their claims related to the P6 prospectus because "none of the [residents] [were] resale purchasers forced to accept the P6 [p]rospectus at closing." As to the Americans with Disabilities Act claim, the district court found that the homeowner's association did not have associational standing under Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333 (1977).  The district court explained that an association only has standing to sue on behalf of its members when (1) "its members would otherwise have standing to sue in their own rights," (2) "the interests it seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of

individual members in the lawsuit." The district court found that the homeowner's association had "not identified any members that would otherwise have standing to sue in their own right," and that the homeowner's association could not, as a matter of law, establish that the Americans with Disabilities Act claim was germane to its purpose.

## STANDARD OF REVIEW

When a district court dismisses a claim for lack of standing, we review de novo the court's legal conclusions and its factual findings for clear error. ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1190, 1195 (11th Cir. 2009). "The party opposing the motion [for summary judgment] must present specific facts in support of its position and cannot rest upon allegations or denials in the pleadings." Martin v. Com. Union Ins. Co., 935 F.2d 235, 238 (11th Cir. 1991). "[W]e may affirm [a district court's] judgment on any ground that finds support in the record." Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) (internal quotation marks omitted).

## DISCUSSION

As they did before the district court, the residents argue that they have standing to bring their RICO claims because they were injured by the defendants' fraudulent scheme to induce sellers to adopt the P6 prospectus. As to the Americans with Disabilities Act claim, the homeowner's association argues that it has

associational standing because: (1) members of the homeowner's association would individually have standing, and (2) advocating for the interests of disabled members is related to the homeowner's association's purpose.

## *RICO Claims*

The residents argue that the district court erred in finding that they lacked standing to bring their RICO claims because the defendants' fraudulent scheme to convince sellers to adopt the P6 prospectus indirectly injured them. We begin with the elements of standing and the basis for the residents' RICO claims.

To establish Article III standing, a litigant "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). At the summary judgment stage, plaintiffs cannot rest on "mere allegations, but must set forth by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." Lujan, 504 U.S. at 561 (internal citation omitted).

The RICO statute makes it "unlawful for any person employed by or associated with" an enterprise engaged in or affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962.

"[R]acketeering activity" includes "any act which is indictable under . . . section 1341 (relating to mail fraud) [or] section 1343 (relating to wire fraud)."  18 U.S.C. § 1961(1)(B).  Mail fraud, in turn, occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting to do so."  Id. § 1341.  Likewise, wire fraud occurs whenever a person uses a wire, radio, or television communication to execute a fraudulent scheme.  Id. § 1343.  The scheme to defraud "requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."  United States v. Bradley, 644 F.3d 1213, 1238 (11th Cir. 2011).

The residents argue that the defendants defrauded the sellers, and that fraud injured the residents indirectly in the amount of "the difference between the lot rents the buyers would have paid if they had been given the opportunity to adopt the pre-P6 prospectus that their sellers had been operating under" and the amount they ended up paying under the P6 prospectus.  The residents argue that injury was caused by the defendants because they induced the sellers to adopt the P6 prospectus before the residents bought homes in Schalamar Creek.

But, even if the residents suffered an injury-in-fact because they were forced to pay a higher rent, they failed to show that the injury they suffered is traceable to the defendants' alleged scheme.  See Jacobson, 974 F.3d at 1253 ("To satisfy the

causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" (quoting Lujan, 504 U.S. at 560)).  We've explained that "an injury is not fairly traceable to the actions of a defendant if [it is] caused by the 'independent action of some third party not before the court' and likewise a controversy is not justiciable when a plaintiff independently caused his own injury."  Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1271 (11th Cir. 2019) (quoting Swann v. Sec'y, Ga., 668 F.3d 1285, 1288 (11th Cir. 2012)).  The residents haven't produced any summary judgment evidence to show that the higher rent is traceable to any "misrepresentation" or "omission,"—i.e., to the defendants' scheme—rather than to the residents' decisions to buy their homes or the sellers' decisions to adopt the P6 prospectus.

First, the residents don't point to "specific facts" showing that any sellers' decision to enter into the P6 prospectus was caused by the defendants' "misstatements" or "omissions."  See Wilding v. DNC Servs. Corp., 941 F.3d 1116, 1126 (11th Cir. 2019) ("The critical question is whether the plaintiffs' injuries are fairly traceable to the defendants' allegedly false statements, and on that question there are just too many unknowns."); cf. Clapper v. Amnesty, Int'l USA, 568 U.S. 398, 414 (2013) ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").  The

residents didn't produce any affidavits, testimony, or statements from any of the sellers who were allegedly defrauded.  In fact, the residents' testimony suggests that the sellers entered into the P6 prospectus so they could get rent concessions or receive other benefits from Schalamar Creek's owners.

For example, Linda Gledhill explained that her seller, Citizens Bank, agreed to the P6 prospectus in exchange for reduced rent at the bank's other properties in Schalamar Creek.  James Driskel explained that his seller agreed to the P6 prospectus so Murex Properties would list his property for sale.  Similarly, Phil Featherbay explained that his seller agreed to the P6 prospectus in exchange for the payment of an "incentive."  But, none of the residents testified that their sellers were misled or defrauded by the defendants' actions.  Without "specific facts," Lujan, 504 U.S. at 561, showing that the sellers were misled by the defendants' representations or omissions, the residents can't show that the defendants caused, directly or indirectly, their injury, see Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1350 (11th Cir. 2016) ("Without reliance on the fraud by someone . . . the plaintiffs would not be able to show that they were injured by reason of the alleged racketeering activity.").

Second, the residents only suffered an injury because they purchased properties in Schalamar Creek that were already subject to the P6 prospectus. Gledhill explained that she purchased her home subject to the P6 prospectus with eyes "wide open" to the fact that she was agreeing to be bound by it.  Driskel said it

was not "material" to him which prospectus governed his home.  And the other residents knew they were agreeing to a lease, and thus to any rents determined by any incorporated prospectus, when they bought their homes.  They couldn't be deprived of their right to assume the sellers' existing lease and prospectus because that's exactly what they voluntarily agreed to do when they bought homes in Schalamar Creek.  See Pevsner v. Eastern Air Lines, Inc., 493 F.2d 916, 918 (5th Cir. 1974) (concluding that plaintiff did not have standing because "any injury would be self-inflicted"); Swann, 668 F.3d at 1288 ("[A] controversy is not justiciable when a plaintiff independently caused his own injury.").  Had it been material to them, the residents could have avoided any injury by buying homes that were subject to a more favorable prospectus.

Thus, the residents' injury was caused by their decision to purchase properties subject to the P6 prospectus or the sellers' agreement to the P6 prospectus, not by the defendants' alleged scheme.  They have not "show[n] that they were injured by reason of the alleged racketeering activity." Ray, 836 F.3d at 1350.  And because the residents cannot show that their injury is traceable to the defendants' scheme, they do not have standing to bring their claims.  See Jacobson, 974 F.3d at 1245.

*Americans with Disabilities Act Claim*

The district court granted summary judgment for Schalamar Creek's owners and operators on the homeowner's association's Americans with Disabilities Act

12

claim because it found that the homeowner's association did not have associational standing under Hunt.  The homeowner's association argues that this was error because:  (1) members of the homeowner's association have individual standing to bring an Americans with Disabilities Act claim, and (2) ensuring Schalamar Creek's clubhouse is accessible to its members is "germane" to its purpose.  We agree with the homeowner's association, but we still conclude that summary judgment was proper because it did not present summary judgment evidence that the proposed modifications to Schalamar Creek's clubhouse were readily achievable.

Associational standing:  Members of the homeowner's association have standing.

An association has standing to bring suit on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests at stake are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  White's Place, Inc. v. Glover, 222 F.3d 1327, 1330 (11th Cir. 2000) (discussing Hunt's associational standing requirements).  Only the first two requirements are at issue in this case.

"In order to sue on behalf of [their] members, organizational plaintiffs need not establish that all of their members are in danger of suffering an injury."  Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1342 (11th Cir. 2014).  "Rather, the rule in this Circuit is that organizational plaintiffs need only establish that 'at least one member

faces a realistic danger' of suffering an injury." Id. (quoting Fla. State Conf. of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1163 (11th Cir. 2008)).  So, the question is whether any of the homeowner's association's members would have standing to bring a claim under the Americans with Disabilities Act.

The Americans with Disabilities Act confers on "any person" the right to "be free from discrimination on the basis of disability with respect to the full and equal enjoyment of the facilities." Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1332 (11th Cir. 2013) (citing 42 U.S.C. § 12182(a)) (cleaned up).  That right is violated when an individual "encounters architectural barriers that discriminate against him on the basis of his disability." Id.  Thus, an individual who encounters architectural barriers "has suffered injury in precisely the form the statute was intended to guard against." Id.

Here, at least some members of the homeowner's association would individually have standing to bring an Americans with Disabilities Act claim.  In response to the defendants' motion for summary judgment, the homeowner's association proferred testimony from Phil Featherbay, who suffers from various disabilities that require him to use a cane; Joette Kelly, who is paralyzed in one leg and uses a wheelchair; and James Driskell, who has a back condition and is partially paralyzed in one leg.  Driskell and Featherbay testified that they have difficulty accessing the common areas of Schalamar Creek due to their disabilities.  For

example, Driskell explained that he had difficulty accessing the upper level of the clubhouse, and the Featherbays explained that they didn't attend functions at the clubhouse because it was not accessible to them.

The homeowner's association also specifically identified barriers at the clubhouse which made it inaccessible to residents, like Driskell, Kelly, and the Featherbays, with "mobility, balance, gait, vision, and hearing difficulties."  For example, the homeowner's association pointed to the lack of an elevator and the inaccessible configuration of the clubhouse bathrooms.  Thus, at least some of the residents have encountered architectural barriers that discriminate against them on the basis of their disabilities.  See Houston, 733 F.3d at 1332.

<u>Associational standing:  Ensuring that the clubhouse is accessible to residents is germane to the homeowner's association's purpose.</u>

Next, we consider whether the interest at stake—the homeowner's association's interest that the clubhouse be accessible to disabled residents—is "germane" to the organization's purpose.  We conclude that it is.

The district court, relying on Drummond v. Zimmerman, 454 F. Supp. 3d 1210, 1221 (S.D. Fla. 2020), concluded that the homeowner's association could not show, as a matter of law, that the Americans with Disabilities Act claim was germane to its purpose, because "[t]he [homeowner's association] exists for the benefit of the homeowners and the mobile home park; it is not a disability advocacy group."  But the district court's understanding of what is germane was too limited.

"[T]he germaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose." Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd., 627 F.3d 547, 550 n.2 (5th Cir. 2010) (quoting Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc., 448 F.3d 138, 148 (2nd Cir. 2006)) (concluding that the Association of American Physicians and Surgeons had standing to sue the Texas Board of Medical Examiners for alleged constitutional violations of member physicians' rights); see also Ctr. for Sustainable Econ. v. Jewell, 779 F.3d 588, 597 (D.C. Cir. 2015) ("The germaneness requirement mandates pertinence between litigation subject and organizational purpose." (quotations marks omitted)).   We considered the germaneness prong of associational standing in White's Place.   There, White's Place, a gentlemen's club, brought a facial overbreadth challenge to a Jacksonville ordinance prohibiting individuals from "opposing a police officer."   White's Place, 222 F.3d at 1327.   We observed that "the ordinance being challenged . . . [did] not directly relate to the interests of the business" because "White's Place [was] a corporation whose primary purpose [was] to present erotic dancing for profit."   Id. at 1330.   We explained that "the ability to oppose a police officer legitimately through spoken words [was] not related sufficiently" to that purpose.   Id.   Thus, we held that the club did not have associational standing to bring a claim on behalf of its dancers because the challenged law was not germane to the club's purposes.   Id.

But, other than in <u>White's Place</u>, we have not found that an association lacked standing to bring a claim on behalf of its members because the litigation was not germane to the association's purpose.  <u>See, e.g.</u>, <u>Greater Birmingham Ministries v. Sec'y of State for Ala.</u>, No. 18-10151, 2021 WL 1323510, at *10 (11th Cir. Apr. 8, 2021) (holding that a lawsuit challenging state voter identification laws was germane to the purposes of the Alabama N.A.A.C.P. and Greater Birmingham Ministries, a social justice charity); <u>Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.</u>, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999) (concluding that a lawsuit challenging OSHA regulations of respiratory standards was germane to the purposes of the American College of Occupational and Environmental Medicine).

Unlike the relationship between the challenged law and the business purpose of the club in <u>White's Place</u>, here the interests at stake are more closely related to the purposes of the homeowner's association.  For example, Florida Rule of Civil Procedure 1.222 gives the homeowner's association authority to act as a class representative and bring suits "in its name on behalf of all association members concerning matters of common interest to the members, including but not limited to: the common property [and] structural components of a building or other improvements."  Fla. R. Civ. P. 1.222.  Florida law also designates the homeowner's association as the representative of "all the mobile home owners in all matters

relating to [the Mobile Home Act], regardless of whether the homeowner is a member of the association." Id. § 723.075(1).

In response, the defendants argue that Florida courts "require complete commonality for all homeowners" for the homeowner's association to have standing. See, e.g., Malco Indus., Inc. v. Featherock Homeowners Ass'n, Inc., 854 So. 2d 755, 757 (Fla. Dist. Ct. App. 2003) (concluding that a homeowner's association did not have standing to enforce a settlement agreement against future purchasers); Amber Glades, Inc. v. Leisure Assoc. Ltd. P'ship, 893 So. 2d 620, 625 (Fla. Dist. Ct. App. 2005) (concluding that a homeowner's association did not have standing to enforce park rules against other residents). But these cases dealt with situations where the members of the homeowner's association had competing interests or no interests at all. Malco, 854 So. 2d at 757 ("[T]he dispute is of limited interest to all homeowners . . . and, as such, the [homeowner's association] is not the proper party to bring the action."); Amber Glades, 893 So. 2d at 625 ("If the mobile homeowners, as a class, include members that will be harmed by the judgment . . . [the homeowner's association] certainly cannot represent all of them."). By contrast, all residents of Schalamar Creek have an interest in making sure that the clubhouse is accessible and compliant with the Americans with Disabilities Act, and there is no issue of conflicting interests, as was the case in Amber Glades. Moreover, the Mobile Home Act gives the homeowner's association the right to institute certain

18

claims when only a majority of members vote in favor; it does not require "complete commonality."  See Fla. Stat. § 723.037 (providing that a homeowner's association has standing to challenge an increase in lot rental amount, a reduction in services or utilities, or a change of rules and regulations if "a majority of the affected homeowners agree").   Thus, the defendants' contention that the homeowner's association's standing requires "complete commonality" is without merit.

For these reasons, we conclude that the homeowner's association has an interest in making sure that the "common property [and] structural components" of Schalamar Creek are accessible to handicapped residents.  See Fla. R. Civ. P. 1.222. Its claim under the Americans with Disabilities Act is germane to its purpose.

<u>The proposed modifications were not readily achievable.</u>

Even if the homeowner's association has standing to bring its claims, the defendants contend that we should still affirm summary judgment because the homeowner's association did not meet its burden to show that the removal of accessibility barriers was "readily achievable."  We agree.

"The [Americans with Disabilities Act] imposes different requirements on the owners and operators of facilities that existed prior to its enactment date [in 1993]." <u>Gathright-Dietrich v. Atlanta Landmarks, Inc.</u>, 452 F.3d 1269, 1273 (11th Cir. 2006).  In an existing facility, "the [Americans with Disabilities Act] states that discrimination includes a private entity's 'failure to remove architectural barriers . . .

19

where such removal is readily achievable.'" Id. (quoting 42 U.S.C. § 12192(b)(2)(A)(iv)).   The Americans with Disabilities Act defines "readily achievable" as "easily accomplished and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9).

In Gathright-Dietrich, we adopted a burden-shifting framework that applies to summary judgment motions in Americans with Disability Act claims based on the removal of architectural barriers.  See 452 F.3d at 1273–74 (adopting the burden-shifting framework set out in Colo. Cross Disability Coal. v. Hermanson Fam. Ltd. P'ship I, 264 F.3d 999, 1007 (10th Cir. 2001)).  Under this framework, "the plaintiff has the initial burden of production to show (1) that an architectural barrier exists; and (2) that the proposed method of architectural barrier removal is 'readily achievable,' i.e., 'easily accomplishable and able to be carried out without much difficulty or expense' under the particular circumstances of the case." Id. at 1273. We explained that "a plaintiff must present sufficient evidence so that a defendant can evaluate the proposed solution to a barrier, the difficulty of accomplishing it, the cost [of] implementation, and the economic operation of the facility.  Without evidence on these issues, a defendant cannot determine if it can meet its subsequent burden of persuasion." Id.

The facts of Gathright-Dietrich are instructive.   There, the plaintiffs "submitted three proposed options" relating to the removal of barriers, but they

"failed to produce any reliable evidence that those proposals were 'readily achievable.'" Id. at 1274.  Further, the proposed modifications "were non-specific, conceptual proposals that did not provide any detailed cost analysis," and the plaintiffs "failed to provide expert testimony to assure the feasibility of their proposed" modifications.  Id.  Finally, the plaintiffs did not "produce a financial expert to link the estimated costs of their proposals with [the defendant]'s ability to pay for them" and "failed to take even the rudimentary steps of formulating what those estimated costs might be or providing any evidence of the [defendant]'s financial position and ability to pay those costs." Id.  The district court granted summary judgment for the defendants, and we affirmed.  Id. at 1272, 1275.  We explained that, given the lack of evidence about the estimated costs or feasibility of the modifications, the plaintiffs didn't carry their burden to show that the proposed modifications were "readily achievable." Id. at 1273.

The same goes here.  The clubhouse pre-dates the Americans with Disabilities Act.  And although the complaint identified deficiencies with Schalamar Creek's clubhouse, the homeowner's association has presented no summary judgment evidence that any of the proposed modifications were readily achievable, choosing instead to rely on the allegations in the complaint.  Even in response to the defendants' expert affidavit explaining why the modifications were not readily achievable, the homeowner's association did not put forth any specific evidence

about the feasibility of their proposals, the estimated costs associated with them, or Schalamar Creek's ability to pay those costs.  Instead, they only presented an expert affidavit that explained why he disagreed with some of the conclusions of the defendants' expert.  This is fatal to their claim.

Like the plaintiffs in <u>Gathright-Dietrich</u>, the homeowner's association has failed to carry its burden to show that the proposed modifications were readily achievable.  Accordingly, the district court properly granted summary judgment for the defendants on the homeowner's association's Americans with Disabilities Act claim.

## CONCLUSION

Because the district court correctly found that the residents did not have standing as to their RICO claims, and the homeowner's association failed to satisfy its burden of proof on its Americans with Disabilities Act claim, we affirm the district court's summary judgment for Schalamar Creek's owners and operators.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 07, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-13415-GG
Case Style:  Schalamar Creek Mobile Homeown, et al v. Steven Adler, et al
District Court Docket No:  8:19-cv-00291-TPB-AEP

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellants.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joseph Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs